704 P.2d 1119

**Malynda Taylor DAVILA, Individually
and as Next Friend of Laramie
Taylor, A Minor, Plaintiff-Appellant,**

v.

**Adrian H. BODELSON, M.D., and
Parke, Davis & Company,
Defendants-Appellees.**

**No. 7484.**

Court of Appeals of New Mexico.

July 2, 1985.
Certiorari Denied Aug. 12, 1985.

Ronald Segel, Saul Cohen, Sutin, Thayer & Browne, P.C., Albuquerque, for plaintiff-appellant.

William K. Stratvert, Alice Tomlinson Lorenz, Steve Vidmar, Miller, Stratvert, Torgerson & Brandt, P.A., Albuquerque, for defendant-appellee Adrian H. Bodelson, M.D.

LeRoi Farlow, Steve Simone, Farlow, Simone & Roberts, P.A., Albuquerque, for defendant-appellee Parke, Davis & Co.

## OPINION

ALARID, Judge.

Plaintiff-Appellant Malynda Taylor Davila (plaintiff) appeals from a judgment in favor of Defendants-Appellees Parke, Davis and Company (Parke, Davis), and Adrian H. Bodelson, M.D. (Dr. Bodelson), in this medical malpractice-strict products liability case. The jury found that Parke, Davis was not liable under strict products liability, that Dr. Bodelson was not negligent, and that plaintiff was negligent, but that her negligence was not a proximate cause of her injuries. The trial court entered judgment based on the verdict. On appeal, plaintiff raises six issues. Plaintiff claims that the trial court committed reversible error in: (1) admitting evidence of plain-

tiff's prior abortions; (2) allowing Parke, Davis and Dr. Bodelson ten peremptory jury challenges; (3) granting Dr. Bodelson's motion in limine which limited plaintiff's cross-examination of Dr. Hutchison; (4) refusing to allow Laramie Taylor to be exhibited to the jury to show his disabilities; (5) giving Parke, Davis' requested jury instructions Nos. 24 and 32; and (6) in refusing to admit evidence of Parke, Davis' 1979 changes in its drug instructions and warnings, and in limiting plaintiff's cross-examination of Dr. Fuchs. We affirm.

## FACTS

Plaintiff became pregnant with Laramie Taylor (Laramie) in 1977, and consulted Dr. Paul Mackel (Dr. Mackel) for pre-natal care. She was admitted to St. Vincent Hospital on February 27, 1978, after her labor had begun. Dr. Mackel administered the drug Pitocin intravenously to her upon admittance, in order to prevent any hemorrhaging after the delivery. Pitocin is a synthetic drug, manufactured by Parke, Davis, which interacts with the uterine muscles to produce contractions of those muscles. Pitocin is most commonly used to induce or reinforce labor. Dr. Mackel used Pitocin as a standby measure, and not to produce a therapeutic effect. About one and a half hours after the administration of Pitocin, Dr. Mackel examined plaintiff and found that Laramie's head was turned sideways, and might be too wide to pass through the pelvis. He felt that forceps could rotate the head but, because he did not use them, he called Dr. Bodelson, an obstetric specialist, for assistance.

Dr. Bodelson examined plaintiff and determined there was room in the birth canal to allow the use of forceps. He felt no tetanic contractions, wherein the muscles are perpetually contracting. He initially determined that there was not an "absolute cephalopelvic disproportion" (CPD), which is a condition where the head is too large to fit through the pelvis. He proceeded to use forceps to rotate the head, but found that the baby could not be delivered with forceps. He then decided to do a Cesarean-section (C-section) delivery, which was per-

formed. The decision to do a C-section was made three to five minutes after he had first tried to use the forceps, and about ten minutes after he had entered the delivery room. He stopped the Pitocin in order to replace it with a glucose-saline solution necessary for the C-section surgery. There were no surgical complications during the C-section. The Pitocin had run for about thirty to forty-five minutes.

At birth, however, Laramie showed signs of severe respiratory distress, which was not stabilized until about ten minutes after the birth. Approximately twenty-four hours after delivery, Laramie developed a seizure disorder, which continued intermittently for almost two years. In addition to the seizure disorder, Laramie developed cerebral palsy, manifesting motor and mental retardation.

Plaintiff brought an action against Drs. Bodelson and Mackel, St. Vincent Hospital, and Parke, Davis. She sued as an individual, and as the next friend of Laramie. St. Vincent Hospital and Dr. Mackel settled before trial.

At trial, plaintiff sought to establish that Pitocin caused severe contractions of the uterus which pinched off the blood supply to Laramie, resulting in a condition known as hypoxia, or a deprivation of oxygen in the brain. Plaintiff alleged that Parke, Davis was strictly liable for marketing a defective and unreasonably dangerous product. Plaintiff alleged that Parke, Davis failed to adequately warn of the danger of Pitocin, and failed to instruct on the proper administration of the drug, all of which proximately caused Laramie's brain damage. Plaintiff did not claim that Pitocin itself was unsafe or defective when accompanied by proper warnings and instructions.

Plaintiff further alleged that Dr. Bodelson was negligent in attempting a forceps delivery because he should have known from available information that a CPD existed, rendering a forceps delivery unworkable. Dr. Bodelson's delay in performing the C-section, argued plaintiff, caused Laramie to undergo an even longer period of

oxygen deprivation brought about by the Pitocin. This delay contributed to Laramie's brain damage.

Dr. Bodelson argued that Pitocin would never have been used by Dr. Mackel if plaintiff had divulged her three prior abortions to him. Dr. Bodelson also contended that Dr. Mackel informed him that Laramie was in no distress when he (Bodelson) arrived. Moreover, Dr. Bodelson maintained that it was safe to make an attempt with the forceps when he did, and that a forceps delivery was quicker, easier and safer than a C-section procedure.

Parke, Davis argued that no evidence established that Pitocin caused the cerebral palsy, that its warnings and instructions were adequate, and, alternatively, that Dr. Mackel was negligent in using Pitocin because Pitocin is contraindicated where a CPD exists, and the existence of a CPD should have been recognized by Dr. Mackel.

## DISCUSSION

### I. ADMISSION OF EVIDENCE OF PRIOR ABORTIONS

Plaintiff had three abortions before her pregnancy with Laramie. During discovery, conflicting evidence was brought out as to whether plaintiff related this fact to Dr. Mackel at the beginning of his treatment of her. Dr. Mackel testified in his deposition, and at trial, that he discussed the issue of prior pregnancy with plaintiff, and that she denied any pregnancies. He also stated that he would not have used Pitocin had he known of these abortions because of the possibility of perforation and scarring of the uterus resulting from the abortions. He made this statement despite his subsequent testimony that his own examination of plaintiff revealed no perforation or scarring. Plaintiff testified that she did disclose her abortions to Dr. Mackel.

Plaintiff made a pre-trial motion in limine to exclude all reference to the abortions on the grounds that any probative value of this evidence was outweighed by the danger of unfair prejudice. The court denied the motion, but directed that any questions concerning prior abortions deal only with the fact of the abortions, and not the reason for the abortions. Plaintiff claims reversible error occurred in allowing the introduction of the evidence. Plaintiff also claims that the prejudice was compounded because, at trial, a question was asked as to the reason for one abortion, which was objected to, and never answered. Plaintiff argues that this violation of the court's previous order further supports reversal.

■ Relevant evidence means "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." NMSA 1978, Evid.R. 401 (Repl.Pamp.1983). However, although relevant, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice...." NMSA 1978, Evid.R. 403 (Repl. Pamp.1983). The appellate issue is whether the result of the trial court's balancing test under Rule 403 constituted an abuse of discretion. *State v. Carr*, 95 N.M. 755, 626 P.2d 292 (Ct.App.1981). An abuse of discretion is found when the trial court's decision is contrary to logic and reason. *Three Rivers Land Co. v. Maddoux*, 98 N.M. 690, 652 P.2d 240 (1982).

■ The issue of plaintiff's negligence, which was raised in the pleadings, was a fact of consequence to the determination of the action. Therefore, any evidence tending to establish that plaintiff breached the duty of ordinary care owed to herself, and that such breach was a proximate cause of the injuries complained of, was relevant. *See* NMSA 1978, UJI Civ. 3.2 and 16.1–16.4 (Cum.Supp.1984). The fact that plaintiff had earlier abortions and, according to Dr. Mackel, did not disclose the abortions to him, is, in itself, inconclusive on the issue of negligence and proximate cause. However, Dr. Mackel's statement that he would not have used Pitocin had he known about the abortions changed the circumstances. Plaintiff's case centered on the allegation that the misuse of

Pitocin was a proximate cause of injury. The evidence that Pitocin would not have been used because of the abortions, and that plaintiff failed to disclose the abortions, had "a tendency to make" her negligence more probable than it would be without the evidence. Evid.R. 401. The evidence could be offered to show that plaintiff breached a duty of exercising ordinary care for her safety in failing to inform her treating physician of her complete medical history when questioned. The evidence could also be offered to demonstrate that this breach proximately caused Laramie's injuries because it resulted in Dr. Mackel's administration of Pitocin. Evidence that prior abortions do not necessarily contraindicate the use of Pitocin, and the absence of evidence that plaintiff knew that Dr. Mackel was going to use Pitocin, or that plaintiff requested Pitocin, do not render the evidence of the abortions irrelevant. It was for the jury to determine, given all the evidence, whether plaintiff breached a duty and whether, under the facts, the breach proximately caused Laramie's injuries. In determining relevancy, we look to the "tendency" of the evidence to make the material fact more probable than it would be without the evidence. This standard has been met. Evidence of the prior abortions, and whether the abortions were disclosed to Dr. Mackel, was relevant.

We can, and do, note that abortion is an issue which sparks emotional controversy in society, *see* NMSA 1978, Evid.R. 201(b)(1) and (f) (Repl.Pamp.1983), and consequently, has the potential for inflaming passions of a jury. *See People v. Morris*, 92 Mich.App. 747, 285 N.W.2d 446 (1979). In this case, however, we cannot ignore the fact that the only evidence relating to plaintiff's negligence was evidence of her failure to inform Dr. Mackel of prior abortions, and the ramifications of that failure. On this basis, we cannot say that the trial court acted in a manner contrary to logic and reason when it determined that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice.

The trial court's order was violated when plaintiff was questioned about the reasons for one abortion. However, plaintiff made no request for a mistrial and, under these circumstances, the trial court did not commit error in not declaring a mistrial or in presenting a cautionary instruction. *See Proper v. Mowry*, 90 N.M. 710, 568 P.2d 236 (Ct.App.1977); *Olsen v. French*, 456 A.2d 869 (Me.1983). Moreover, the issue of the effect of the violation, because of plaintiff's failure to ask for a mistrial, or failure to request a cautionary instruction, is not properly preserved on appeal. *Moritz v. State*, 465 N.E.2d 748 (Ind.App.1984).

The trial court is affirmed on its admission of evidence relating to prior abortions.

## II. NUMBER OF PEREMPTORY JURY CHALLENGES

Plaintiff asserts that the trial court erred in granting each defendant five peremptory challenges. Plaintiff argued at a pre-trial conference that there existed no diverse interest between defendants which would allow them extra challenges under NMSA 1978, Civ.P. Rule 38(e) (Cum.Supp. 1984).

This case was tried under the principle of comparative fault, without joint and several liability. *Bartlett v. New Mexico Welding Supply, Inc.*, 98 N.M. 152, 646 P.2d 579 (Ct.App.1982). The amended answers of Dr. Bodelson and Parke, Davis raised the negligence of other parties to the suit; and Dr. Bodelson additionally raised independent intervening cause as a defense. In fact, Parke, Davis attempted to show that Pitocin was contraindicated because there was a recognizable condition of CPD. Dr. Bodelson attempted to show that there was no CPD when he first examined plaintiff and that, therefore, a forceps attempt was not impractical at that point. Diverse interests were established. Under these circumstances, the trial court did not err in granting each defendant five peremptory challenges. *Sewell v. Wilson*, 101 N.M. 486, 684 P.2d 1151 (Ct.App.1984).

## III. LIMITATION OF CROSS–EXAMINATION OF DR. HUTCHISON

Plaintiff alleges error in the trial court's order granting Dr. Bodelson's pretrial motion in limine, which prohibited questioning Dr. Bodelson, or any medical expert witness, with regard to the existence and source of medical malpractice insurance. Specifically, plaintiff claims the trial court committed reversible error in not allowing her to cross-examine Dr. Hutchison, Dr. Bodelson's expert, about certain provisions of the Medical Malpractice Act (Act), NMSA 1978, Sections 41–5–1 to –28 (Repl. Pamp.1982).

Through examination of Dr. Hutchison, plaintiff sought to establish that Dr. Hutchison was a qualified health care provider under Section 41–5–5 of the Act. Dr. Bodelson was also a qualified health care provider. As such, Dr. Hutchison was subject to assessment for a surcharge in order to maintain the "Patient Compensation Fund" (Fund), established under Section 41–5–25 of the Act. The Fund is called upon to pay a portion of a malpractice judgment in excess of $100,000. Section 41–5–6. Annual surcharges levied against participating health care providers maintain the Fund at a certain level. Thus, plaintiff sought to establish a personal bias of Dr. Hutchison for his providing evidence favorable to Dr. Bodelson. A verdict for Dr. Bodelson could reduce Dr. Hutchison's exposure to an annual surcharge.

Primarily because the other two defendants were still involved in the case at the time of the ruling and had no apparent relationship to the Fund, and because references to the Fund would constitute allusions to "insurance," the court ruled that questioning involving the Fund would be unduly prejudicial to the defendants. Plaintiff subsequently made an offer of proof in order to renew her attempt at questioning during trial, after the other defendants had settled, and the court reiterated its ruling. Plaintiff contends that this ruling impermissibly abridged her right to bring out bias, and impeach Dr. Hutchison. Plaintiff contends she was denied a fair trial.

Evidentiary disclosures of insurance coverage are not, per se, prohibited in New Mexico when used for a purpose other than to prove that a person acted negligently or otherwise wrongfully. NMSA 1978, Evid.R. 411 (Repl.Pamp.1983); *Safeco Insurance Co. v. United States Fidelity & Guaranty Co.*, 101 N.M. 148, 679 P.2d 816 (1984). In fact, disclosure of insurance coverage in an attempt to impeach a witness was expressly permitted in *Mac Tyres, Inc. v. Vigil*, 92 N.M. 446, 589 P.2d 1037 (1979). Our supreme court has held that the trial court has a great deal of discretion in deciding when to admit this type of evidence, which requires, even when it falls within one of the exceptions to Evid. Rule 411, a balancing of the probative value against the prejudicial effect and against other considerations listed in Evid. Rule 403. *Mac Tyres; Safeco Insurance Co.*

Exclusion of evidence of insurance coverage has resulted in reversible error only when, in addition to abuse of discretion, we have found prejudice from the exclusion. *Mac Tyres; Selgado v. Commercial Warehouse Co.*, 86 N.M. 633, 526 P.2d 430 (Ct.App.1974). On the present record, we find no abuse of discretion and no prejudice resulting from the limitation on cross-examination. Dr. Hutchison's testimony on the appropriateness of Dr. Bodelson's attempt to deliver with forceps was merely corroborative of other expert testimony. Drs. Messer, Spalding and Fuchs also testified, along with Dr. Bodelson, that the initial use of forceps was entirely proper under the circumstances Dr. Bodelson encountered. No claim of error has been raised by plaintiff as to the impermissible exclusion of insurance coverage as it might relate to the impeachment of these other experts. We conclude that no reversible error was committed.

## IV. REFUSAL TO ALLOW CHILD TO BE EXHIBITED TO THE JURY

Plaintiff alleges reversible error in the trial court's refusal to allow her

to demonstrate Laramie's disabilities to the jury. A videotape of Laramie undergoing speech and occupational therapy was shown to the jury, and there was testimony as to Laramie's physical condition. The demonstration to the jury, under these circumstances, would be cumulative evidence. Such evidence is admissible within the court's discretion, *State ex rel. State Highway Commission v. Steinkraus*, 76 N.M. 617, 417 P.2d 431 (1966), and we find no abuse of that discretion in excluding the demonstration. The trial court is affirmed on this issue.

## V. PARKE, DAVIS' REQUESTED JURY INSTRUCTIONS NOS. 24 and 32

█ Plaintiff asserts reversible error was committed by the court's giving of Parke, Davis' Requested Jury Instruction No. 24 (Court's Instruction No. 24). The instruction reads:

There are some products which, even when properly prepared and labeled, cannot be made safe for their intended and ordinary use. Because of the nature of ingredients or natural characteristics of the product, use of these products involve substantial risk of injury, and some users will necessarily be harmed. Such products are said to be unavoidably unsafe.

Unless the product unreasonably exposes users to risk of injury, there is no liability for supplying an unavoidably unsafe product. Whether users are unreasonably exposed to risk of injury turns upon a balancing of the dangers and benefits resulting from the product's use.

Where exposure to risk of injury from use of an unavoidably unsafe product is unreasonable the supplier is liable for physical harm proximately caused by the products [sic] use. The supplier's liability extends to persons who can reasonably be expected to use the product.

This instruction is NMSA 1978, UJI Civ. 14.19 (Repl.Pamp.1980), dealing specifically with unavoidably unsafe products. Such products are those that are "quite incapable of being made safe for their intended and ordinary use." RESTATEMENT (SECOND) OF TORTS, § 402A comment k (1965). Plaintiff argues that the "Directions For Use" for UJI Civ. 14.19 mandate that the instruction is to be given only where plaintiff presents sufficient evidence that the product's hazardous characteristics are of such magnitude that the product should not have been marketed. She contends that her theory of the case was that Pitocin was unreasonably dangerous because of inadequate directions and warnings, and not because Pitocin was inherently unsafe by its nature. She points to evidence that Pitocin could be made safe for its intended use with adequate instructions for use and warnings. Her objection to the instruction at trial was on the basis of lack of evidence to support the instruction.

█ An instruction on a theory is properly given only if the theory is plead or is tried by express or implied consent of the parties, *Rice v. Gideon*, 86 N.M. 560, 525 P.2d 920 (Ct.App.1974), and there is evidence supporting the theory. *Tapia v. Panhandle Steel Erectors Co.*, 78 N.M. 86, 428 P.2d 625 (1967). With regard to the evidence, we do not read the "Directions For Use" for UJI Civ. 14.19 as narrowly as plaintiff. Irrespective of which party tenders the evidence, the instruction is properly given when there is evidence (1) that a product cannot be made safe for its intended and ordinary use even when properly prepared and labeled; (2) that use of the product involves a medically recognizable risk of injury; and (3) that the injury complained of results from the intended use of the product. *Perfetti v. McGhan Medical*, 99 N.M. 645, 662 P.2d 646 (Ct. App.1983); *Hines v. St. Joseph's Hospital*, 86 N.M. 763, 527 P.2d 1075 (Ct.App.1974). Under UJI Civ. 14.19, the jury then must determine whether the benefits outweigh the risks in using the product in order to decide if the product unreasonably exposes the user to a risk of injury.

Drs. Spalding and Marshall both testified that even with proper administration and supervision, Pitocin can cause hypertonic contractions in patients. Hypertonic contractions squeeze extremely hard, and are too long in duration. Dr. Spalding testified that these contractions pose an immediate threat to the fetus because they act to cut off the blood supply to the uterus. This interruption of blood causes a shortage of oxygen to the fetal brain. Dr. Spalding testified that, as a medical probability, he was of the opinion that Pitocin caused Laramie's brain injury and subsequent cerebral palsy. Other evidence indicated that, despite the risk attending the use of Pitocin, Pitocin is a valuable and beneficial drug for the induction of labor. We conclude there was evidence supporting the giving of the instruction.

Additionally, the unavoidably unsafe theory was tried by the implied consent of the parties. Neither party at trial objected to (1) the evidence of Pitocin's inherently unsafe nature; (2) evidence of the risk of injury resulting from the use of Pitocin; or (3) the evidence that Laramie was harmed as a result of the use of Pitocin. *See Rice v. Gideon.* Plaintiff objected to the instruction on the basis of insufficient evidence, and not on the basis that the theory was irrelevant to the proceedings and not at issue. The trial court properly tendered the instruction.

Plaintiff also argues error occurred in the giving of Instruction No. 26, a non-UJI instruction. This instruction was Parke, Davis' Requested Instruction No. 32. The instruction read:

If the Pitocin did not cause the cerebral palsy alleged by plaintiff, then there can be no liability on Parke, Davis, even though you find the warning inadequate.

Because the issues instruction (No. 1), the proximate cause instruction (No. 28), and the products liability instruction (No. 17) adequately covered the issues of causation, it was error to give Instruction No. 26. *See Malczewski v. McReynolds Construction Co.,* 96 N.M. 333, 630 P.2d 285 (Ct. App.1981). The standard for review for determining if this non-U.J.I. instruction constitutes reversible error is the slightest evidence of prejudice. *State v. Gillette,* 102 N.M. 695, 699 P.2d 626 (Ct.App.1985). After reviewing the record, we conclude there was no showing that the inclusion of this repetitious instruction prevented plaintiff from receiving a fair trial.

## VI. SUBSEQUENT CHANGE IN LABELING INSTRUCTIONS, AND CROSS–EXAMINATION OF DR. FUCHS

Plaintiff asserts it was error to exclude Parke, Davis' 1979 Physician's Desk Reference (P.D.R.) listing for Pitocin, which differed from the 1978 listing, which was introduced. The 1978 listing was in effect at the time of Laramie's birth. The 1979 listing differed from the 1978 listing in the following ways: (1) the 1979 listing stated that an infusion pump for the administration of Pitocin was "necessary" for safe administration, a precaution not contained in the 1978 listing; (2) the 1979 listing charted dosage in milliunits per minute, and not, as in 1978, in "drops" per minute; and (3) the 1979 listing stated that external "electronic" monitoring of the fetal heart rate was necessary for safe administration, while the 1978 listing stated that "frequent monitoring" was "recommended."

In a pre-trial motion in limine, Parke, Davis sought to exclude the 1979 listing as a subsequent remedial measure under NMSA 1978, Evid. Rule 407 (Repl.Pamp. 1983). Rule 407 provides:

When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control or feasibility of precautionary measures, if controverted, or impeachment.

Plaintiff's counsel initially argued that Rule 407 did not apply to a strict products

liability claim as advanced by plaintiff. However, on the day of trial, prior to the court's ruling on the motion, plaintiff's counsel agreed that Rule 407 was applicable to her claim, and that he would "not argue that point." He asked the court to fashion a ruling on the 1979 listing which would allow the listing to come in should the issue of feasibility arise, or for the purpose of impeachment at trial. The Court agreed to limit its ruling "so that if an issue as to impeachment or feasibility does arise during the testimony of the case * * * the Court will then reconsider the request to exclude the subsequent PDR." The court then granted the motion in limine. On appeal, we do not review the applicability of Rule 407 to a strict products liability action because plaintiff concurred with the trial court's ruling that Rule 407 applied to the action, and plaintiff only sought to offer the 1979 listing under the feasibility exception to Rule 407.

The 1979 listing would be admissible under Rule 407 to demonstrate the feasibility of making changes in 1978 if Parke, Davis controverted feasibility. Parke, Davis contends that it never challenged the feasibility of incorporating plaintiff's suggested changes in labeling. The 1979 changes were revisions that plaintiff's experts testified were necessary to make the 1978 directions adequate. Parke, Davis took the position that, although feasible, the 1979 revisions were unnecessary for the safe utilization of Pitocin. Parke, Davis points out that plaintiff's experts were permitted to testify without objection to the changes which could have been implemented.

During plaintiff's cross-examination of Dr. Fuchs, Parke, Davis' expert, counsel for Parke, Davis objected when Dr. Fuchs was asked whether it would have been feasible in 1978 to incorporate into the warning a clause that fetal hypoxia was an adverse reaction to Pitocin. A bench conference was held, and counsel for Parke, Davis argued that feasibility was not an issue in the case. Counsel for plaintiff responded that feasibility was always an issue, and suggested that Parke, Davis stipulate that the suggested changes were

feasible in 1978. Counsel for Parke, Davis refused to stipulate, and the court sustained Parke, Davis' objection on the ground that feasibility was not an issue.

Plaintiff then made a tender of proof wherein Dr. Fuchs stated that it would have been feasible in 1978 to (1) list fetal hypoxia as an adverse reaction; (2) to list the dosage in terms of milliunits; and (3) to state that an infusion pump and external electronic monitoring were necessary for safe administration. At the end of the tender, plaintiff's counsel asked that the testimony be admitted, and, again, the court refused to admit the testimony on the ground that feasibility was not an issue.

■■■ We do not view the failure to stipulate to feasibility as controverting feasibility. The plain language of Rule 407 does not require defendant to stipulate in order to avoid the operation of the feasibility exception. *Werner v. Upjohn Co.*, 628 F.2d 848 (4th Cir.1980); *Contra Herndon v. Seven Bar Flying Service, Inc.*, 716 F.2d 1322 (10th Cir.1983). Parke, Davis' objection to plaintiff's question regarding feasibility was, however, inconsistent with its attitude toward feasibility during plaintiff's case, where no objections were made. If feasibility was not actually controverted, we fail to understand why Parke, Davis objected to plaintiff's cross-examination in light of the previous testimony.

■■■ Ultimately, we need not decide if feasibility was an issue because it is not determinative to the appeal. Assuming that feasibility was an issue, the language of Rule 407 then permits evidence of subsequent measures. Rule 407 does not mandate that such evidence be admitted. Plaintiff introduced evidence through Drs. Spalding and Marshall that the 1979 changes would have been possible in 1978. There was no evidence introduced by Parke, Davis which controverted this claim. Under these circumstances, the introduction of the 1979 listing would have been cumulative. *See Knight v. Otis Elevator Co.*, 596 F.2d 84 (3d Cir.1979). Exclusion of the 1979 listing, therefore, was harm-

254

less, and not reversible. *Bolen v. Rio Rancho Estates, Inc.*, 81 N.M. 307, 466 P.2d 873 (Ct.App.1970).

Plaintiff also claims error in the exclusion of Dr. Fuchs' tendered testimony on the basis that feasibility was in issue. Here, again, the error was harmless because the testimony was cumulative. *Bolen.*

Plaintiff's final argument on appeal is that the 1979 listing was admissible under Rule 407 because the listing would serve to impeach Dr. Fuchs. Dr. Fuchs testified in the tender that "it would not have been justified" to include in the 1978 listing a directive that an infusion pump and electronic monitoring were necessary for the safe administration of Pitocin. The 1979 listing did contain such mandatory language. After the tender, plaintiff's counsel concluded:

> Dr. Fuchs, with respect to at least one of those statements, said it wouldn't have been justified to say that, and interestingly enough, Parke, Davis said that thing the very next year and I think that's something in light of this witnesses [sic] answer that the jury is entitled to know.

The court, however, excluded the tendered testimony solely on the basis of the absence of a feasibility issue. We do not believe that counsel's remarks sufficiently alerted the trial court that plaintiff was offering the tendered testimony and 1979 listing for the impeachment of Dr. Fuchs. Plaintiff, therefore, can not raise the issue for the first time on appeal. *Perry v. Staver*, 81 N.M. 766, 473 P.2d 380 (Ct.App. 1970). Even assuming impeachment was properly raised, the exclusion of the evidence was harmless because plaintiff's experts previously had testified that the 1978 directions and warnings were inadequate and should be changed. The value of the impeachment would have been cumulative.

The judgment as to both defendants is affirmed. No costs are awarded on appeal.

IT IS SO ORDERED.

NEAL and BIVINS, JJ., concur.