**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**Filed 7/17/96**

**TENTH CIRCUIT**

CINDY S. GARDNER, by and through
her guardian, Michael S. Gardner,

      Plaintiff-Appellant,

v.

CHRYSLER CORPORATION, a
Delaware corporation,

      Defendant-Appellee,

and

No. 95-3255

KEIPER RECARO, INC., also known as
ATWOOD AUTOMOTIVE, INC., a
Michigan corporation; BERTRAND
FAURE, INC.; and BERTRAND
FAURE, LTD., a Canadian corporation,

      Defendants.

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 91-CV-1496)**

Chan P. Townsley (Christopher P. Christian with him on the briefs), Hutton & Hutton,
Wichita, KS, for Plaintiff-Appellant.

Thomas O. Baker (Patricia A. Rosa, Baker Sterchi Cowden & Rice, L.L.C., Kansas City,
MO; James R. Jarrow, Baker Sterchi Cowden & Rice, L.L.C., Overland Park, KS; and

Larry A. Withers, Kahrs, Nelson, Fanning, Hite & Kellogg, Wichita, KS, with him on the brief), Baker Sterchi Cowden & Rice, L.L.C., Kansas City, MO, for Defendant-Appellee.

---

Before **SEYMOUR,** Chief Judge, and **PORFILIO** and **ANDERSON**, Circuit Judges.

---

**PORFILIO**, Circuit Judge.

---

Cindy Gardner suffered an acute frontotemporal intracranial hemorrhage resulting in permanent brain damage which has confined her to a wheelchair after an automobile accident. In this action, she contends defendant Chrysler Corporation defectively designed the pedestal-mounted, high-backed front seat upon which she was seated because it failed to provide essential protection for her in a modest rear-end collision. In fact, Ms. Gardner was trajectiled into the third rear passenger seat. It is controversial whether this occurred at the moment of the collision or when the vehicle swerved into a ditch and flipped over before righting itself. Nonetheless, her seat back broke, and there was no seat belt fastened over her to counter the trajectory. Despite her effort to establish the seat back failed when the intermediate plate rivet, the mechanism limiting its forward and backward movement, sheared under the load forces, a jury determined Chrysler was not liable under either a theory of strict liability or negligence. Ms. Gardner now attacks that verdict claiming it is the product of the trial court's creation of a

- 2 -

judicial exception to Kansas law prohibiting the introduction of the nonuse of seat belt evidence to establish fault and abnegation of its gatekeeper role in the trial process. Having reviewed the record and Kansas law, however, we find no support for these contentions. We therefore affirm.

On December 3, 1989, Ms. Gardner was a front seat passenger in a 1988 Dodge Caravan (the Minivan); her sister, Terri Garrison, at the wheel; and Terri's five-year-old daughter, Kimberly, in Ms. Gardner's lap. Two other children were seated on the rear seats. At the time of the collision, no one in the Minivan was wearing a seat belt. As Ms. Garrison turned onto a county road, a 1988 Toyota Celica rear-ended the Minivan, causing it to yaw or rotate around before skidding sideways into a ditch and tripping or turning over, hitting the side of the ditch, and righting itself. Ms. Gardner was found seriously injured in the third rear seat, while the others, scattered between the seats and one partway out a rear window, sustained only minor injuries.

At trial, Ms. Gardner's accident reconstruction focused on the initial impact in which, she maintained, the recliner mechanism attaching the seat back to the seat's lower cushion failed, causing the seat back to collapse rearward and projectile her into the Minivan's third rear seat. At some point in that trajectory, Ms. Gardner hit her head, causing a subdural hematoma, a localized bleed into her brain which has permanently incapacitated her. Ms. Gardner alleged the rivet attaching the recliner mechanism to the seat back was too small to resist a moving force in the foreseeable event of a rear-end

collision in which the seat back is designed as the passenger's primary protection. Although this seat back complied with Federal Motor Vehicle Safety Standard 207 (FMVSS 207), the applicable performance standard issued by the National Highway Transportation Safety Administration (NHTSA), she contended the standard represented only a minimum requirement for the loads seat backs must withstand and consequently did not relieve Chrysler of its liability for the defective seat design. In the ensuing battle of the experts, Ms. Gardner's witness, Dr. Kenneth Salczalski, a consulting engineer, described his effort beginning in 1989 to change the federal seat back standard, increasing substantially the amount of weight a seat back would have to resist. In effect, his theory was predicated on producing a seat back that was almost rigid in order to provide what he opined was the appropriate protection to its occupant. Under this theory, Dr. Salczalski testified that in rear collisions, data suggested seat belts reduced harm by only about ten percent.

Chrysler's theory of defense discounted the first impact when the Toyota collided with the Minivan at a "closing velocity" calculated at about 20-25 mph, which it considered insufficient to overload the seat back. Instead, its experts opined in the second and third impacts, as the Minivan pirouetted, hitting the ditch initially and turning on its side in a clockwise rotation, Ms. Gardner was thrown forward perhaps hitting the

windshield or headliner[1] before the seat back failed, jettisoning her into the rear seat. In that third impact, Chrysler claimed the 190-pound force of Ms. Gardner's and Kimberly's hitting the seat back without any other counter restraint caused the seat back to yield or fail.

Key to this theory was Chrysler's contention the seat back was designed to yield or absorb energy when impacted. Chrysler maintained that design contemplated utilization of the seat belt which, it asserted, was integral to the seat design. Thus, Chrysler insisted the seat back design not only exceeded the FMVSS 207 requirement but also best protected its occupant when used in conjunction with the seat belt to yield and absorb the passenger's load force.

Ms. Gardner now complains when Chrysler injected the seat belt issue into evidence, it tainted her trial, permitting the jury to equate her nonuse with fault and to divest Chrysler of responsibility for the defective seat back. She alleges her effort to immunize the trial from this infection, a motion in limine prohibiting Chrysler from any reference to seat belts during the presentation of evidence, was denied in contravention of

---

[1]Pretrial, Chrysler moved to dismiss this action claiming its defense was debilitated by the spoilation of the front end of the Minivan. Although the trial court denied the motion, it permitted Chrysler to tell the jury that because, through neither party's fault, the Minivan's front end was sold for salvage, it was not available for inspection. Consequently, Chrysler maintained it was unable to verify its theory Ms. Gardner hit the windshield or headliner by producing tissue fragments or blood samples.

Kan. Stat. Ann. § 8-2504(c). That error, she insists, was not cured by the court's limiting

Instruction No. 16 and now requires a new trial.

I. Kan. Stat. Ann. § 8-2504(c)

Under this Kansas statute:

> Evidence of failure of any person to use a safety belt shall not be admissible
> in any action for the purpose of determining any aspect of comparative
> negligence or mitigation of damages.

To date, the only Kansas case addressing Kan. Stat. Ann. § 8-2504(c) is ***Watkins* v.**

***Hartsock***, 245 Kan. 756, 783 P.2d 1293 (1989), in which the Kansas Supreme Court

traced the development of the laws requiring the use of seat belts and child safety

restraining systems in Kansas. Although the Kansas legislature enacted a statutory

requirement that manufacturers equip passenger cars with seat belts as early as 1965, the

use of seat belts was not mandatory, especially because older cars would not be so

equipped. With no statutory duty to use a seat belt, Kansas courts refused to shift fault to

the non-wearer for fear that an insurer might try to evade coverage under a policy or to

prevent actual wrongdoers from avoiding liability. *See, e.g.*, ***Hampton* v. *State Highway***

***Comm'n***, 209 Kan. 565, 498 P.2d 236 (1972) (no duty to use a seat belt under the

common law standard of due care or to mitigate damages). Nevertheless, as the Kansas

courts infiltrated this principle with more complex analyses of duty under the common

law, "the legislature modified the seat belt law to clarify its intent." *Watkins*, 783 P.2d at

1298; *see also **Rollins v. Kansas Dept. of Transp.***, 238 Kan. 453, 711 P.2d 1330 (1985).

- 6 -

The result was Kan. Stat. Ann. § 8-2504(c), prohibiting evidence of nonuse of safety belts "in any action **for the purpose of determining any aspect of comparative negligence or mitigation of damages."** (emphasis added). The Child Passenger Safety Act was similarly amended in 1989 to prohibit evidence of the failure to secure a child in a child safety seat "for the purpose of determining any aspect of comparative negligence or mitigation of damages." Kan. Stat. Ann. § 8-1345(a). The *Watkins* court concluded the legislature thus evidenced an intent to modify the common law in this amendment rejecting defendant's effort to introduce "general principles of tort law" into the analysis. For purposes of establishing <u>fault</u> or mitigating damages, then, evidence of nonuse of seat belts is inadmissible "in any action" in Kansas.

Ms. Gardner propounds "in any action" includes a products liability action in which a manufacturer may be found strictly liable by virtue of placing a defective product into the marketplace. Indeed, her counsel crafted the lawsuit as a crashworthiness case, alleging the vehicle's design failed to protect its occupants from "enhanced" injuries during a second collision when the occupant continues to move inside or is ejected from the vehicle. Given Kansas law imposing a strict duty on manufacturers to design reasonably safe products for ordinary or anticipated use, *Prince v. Leesona Corp., Inc.*, 720 F.2d 1166, 1171 n.9 (10th Cir. 1983); *Lindquist v. Ayerst Lab., Inc.*, 227 Kan. 308, 607 P.2d 1339, 1349 (1980), Ms. Gardner contends it is irrelevant whether the Minivan was even equipped with a seat belt. The only issue for the jury is whether the product, the

- 7 -

seat back, is defective. Permitting the jury to consider whether she wore her seat belt, she contends, amounted to asking it to judge whether she was at fault and contributorily negligent. The camel thus in the tent, her trial became a foregone conclusion, she plaints.

The district court disagreed with this argument and denied Ms. Gardner's motion in limine. After a hearing, it concluded *Watkins* would not preclude the introduction of nonuse evidence in a crashworthiness case,[2] believing the jury is

> entitled to consider all of the evidence and whether this vehicle's design was insufficiently crashworthy, including the effect of proper use of seat belts, and thus the company is at liberty to address it to explain it as it pertains to the whole of things in the design of the ... seat assembly and in its intent or effort to demonstrate that their structure or design is not unreasonably dangerous or defective.

The district court announced it would tell the jury the Minivan was equipped with a seat belt which Ms. Gardner was not wearing; her nonuse did not constitute fault; but was

---

[2]Indeed, in **Watkins v. Hartsock**, 245 Kan. 756, 783 P.2d 1293 (1989), after a foray into the issue of misuse of safety restraints, the court inserted the observation:

> In an automobile product liability action, the manufacturer is allowed to introduce into evidence the nonuse or misuse of its product by the user for the purpose of (1) comparing negligence and (2) defending the design of the vehicle when crashworthiness is asserted as a theory of liability. In either situation, the failure to use seat belts is treated no differently than the failure to properly use safety devices. For purposes of comparing negligence in product liability cases, evidence of a plaintiff's nonuse or misuse of an available safety restraint is a factual issue to be submitted to a jury.

*Id.* at 1299 (citing **Lowe v. Estate Motors Ltd.**, 428 Mich. 439, 410 N.W.2d 706 (1987)).

admissible to disprove her contention the seat assembly was defective.  Instruction No.

16, which embodied this conclusion, read:

> You may consider the fact that the Chrysler minivan was equipped with a
> seat belt restraint system for the sole purpose of determining whether the
> overall design of the seat assembly was defective and unreasonably
> dangerous.  However, you may not consider Cindy Gardner's nonuse of
> seatbelts in determining whether she was negligent or otherwise at fault for
> her own injuries.

Before we tackle the legal question presented, whether Kansas law permits

evidence of nonuse of a seat belt for the purpose of establishing a defect,  it is helpful to

set the context in which the record discloses this issue arose.  During the voir dire of the

jury, the court set out each party's theory of the case, telling the jury of Chrysler's

position:

> [T]he seat assembly includes the engagement and the use of a seat belt
> that's intended, of course, for the purpose of restraint and for the safety of
> any occupant, and they claim and will show from their evidence that when
> it's in place and used ... its seat assembly is just not defective, nor is it
> negligent in its design .... I say that to you cautiously because the evidence
> of the absence of a seat belt is not shown here, nor argued here to say that
> this young lady herself was at fault and negligent or bears responsibility, but
> rather that it's offered here by the defense to show that with its placement in
> the design of the whole of things ... this product is just not defective ....

Ms. Gardner asserts she was thus forced to address the seat belt issue although the

rejection of her motion in limine certainly prepared her to counter the defense.  Moreover,

contrary to her representation she did not open the door to Chrysler's defense, in a

February 27, 1995 hearing addressing her motion to compel Chrysler to respond to

interrogatories about rear end crash tests, plaintiff's counsel impressed upon the court the essentiality of this evidence:

> [O]ur case is not based on simply the recliner mechanism because we allege that the seat as a complete unit is the occupant restraint device for a rear impact, and, therefore, the seat is important, the environment of the seat, which is the minivan ....

Later, counsel represented, "we contend that the entire occupant restraint system in these seats is defective. It's a design defect." Counsel had posited this case on a theory of crashworthiness, citing **Larsen v. General Motors Corp.**, 391 F.2d 495 (8th Cir. 1968), and claiming the Minivan's seat design, "the environment of the seat," is defective. Although Ms. Gardner consistently argued "the primary occupant restraint system in a rear impact crash is the seat back," a primary component is still only one component of the restraint system and does not subsume or exclude other design elements' secondary or conjunctive features. Surely, it strains credulity to argue the seat environment does not include a seat belt, the essential safety mechanism consumers fought years to have automobile manufacturers install in their vehicles as protection in front and rear end crashes. Consequently, when the court concluded, in denying the motion in limine, that the seat belt has bearing on whether "the seat assembly itself -- the whole thing -- is unreasonably dangerous," the court's predicate was *plaintiff's* crashworthiness theory.[3]

---

[3]We would note Ms. Gardner has argued the court erred in rejecting her evidence of the percentage of Kansas drivers who do not use seat belts in order to establish a foreseeable use of driving a vehicle is without "the optional seat belt restraint." She

(continued...)

Moreover, Chrysler vigorously contested the court's "splitting the baby," permitting it to argue the nonuse of the seat belt for the purpose of disproving the Minivan's seat design defect but not to prove fault in causing plaintiff's enhanced injuries. Chrysler insisted Kansas law allowed the introduction of seat belt evidence for the purpose of comparing the parties' negligence when the crashworthiness of the vehicle is alleged. The trial court disagreed, adamant that the jury would hear all of the evidence plaintiff would offer to prove the seat design was defective and permit Chrysler to introduce seat belt evidence to prove the design is not unreasonably dangerous or defective.

In so ruling under Ms. Gardner's theory of the case, the legal question remains: does this resolution comply with Kan. Stat. Ann. § 8-2504(c)?[4] Ms. Gardner contends it does not, urging a reading which essentially eliminates the clause following "in any

---

[3](...continued)
sought to characterize the "alternate design of optimum safety features," that is, driving with the seat belt fastened ,as not within "the ranges of driving conditions and circumstances that could reasonably [sic] anticipated by the designers and engineers of the car." (quoting *Culpepper v. Volkswagen of America, Inc.*, 109 Cal. Rptr. 110, 115, 33 Cal. App. 3d 510, 517-18 (1973). Nevertheless, the trial court properly excluded this evidence on the basis of relevance, recognizing the likelihood of its raising questions of avoidable consequences and other negligence questions which lurked within the "foreseeable use" message.

[4]On appeal, Chrysler contends Ms. Gardner has lost this issue because of her failure to object under 10th Cir. R. 28.2(c). However, Ms. Gardner easily overcomes this argument having adequately presented the matter to the trial court before trial and received a definitive ruling. *Pandit v. American Honda Motor Co., Inc.,* 82 F.3d 376, 380 (10th Cir. 1996).

action," to bar nonuse of seat belt evidence in all actions for all purposes. This interpretation misstates legislative intent and the plain meaning of the statute.

We begin our plenary review with certain elemental rules of statutory construction. Under the plain meaning rule, we seek the meaning of the statute from its very language, and if it is straightforward, we simply enforce it according to its terms. Its words then bear "their ordinary meaning and the statute is not to be read so as to add or subtract from [that] which is stated...." ***R.D. Anderson Const. Co., Inc. v. Kansas Dept. of Human Resources***, 7 Kan. App. 2d 453, 643 P.2d 1142, 1146 (1982) (citations omitted). We presume no terms are surplusage. ***Felten Truck Line, Inc. v. State Bd. of Tax Appeals***, 183 Kan. 287, 327 P.2d 836 (1958).

When we apply these rules to Kan. Stat. Ann. § 8-2504(c), its language conveys the legislature's intent to bar admission of evidence of nonuse of a safety belt in any action where the purpose of its introduction is to establish comparative negligence or to mitigate damages. If introduced for another purpose, to defend allegations of a defect or to establish its presence in the vehicle, § 8-2504(c) does not apply.

This reading not only comports with the plain meaning of the statute but also reflects the interpretive tenet *expressio unius est exclusio alterius*, the legislature's defining the reach of a statute implies that matters beyond that reach are not included. ***Freightliner Corp. v. Myrick***, ___ U.S. ___, 115 S.Ct. 1483, 1488 (1995); ***Degollado v. Gallegos***, ___P.2d ___, 1996 WL 28728 (Kan. 1996); ***State v. Favela***, 259 Kan. 215, 911

P.2d 792, 797 (1996). That the legislature specifically stated those two instances in which evidence is inadmissible permits the inference other uses are permissible. Furthermore, by Kansas law, statutes in derogation of the common law "shall be liberally construed to promote their object." Kan Stat. Ann. § 77-109. Thus, read within the whole of Article 25, which addresses seat belts, Kan. Stat. Ann. § 8-2504(c), reflects the legislature's intent to make their use mandatory but to minimize any penalty for nonuse,[5] and to isolate their nonuse from any connotation of fault. To read the statute more broadly defeats that legislative intent.

*Watkins* is not to the contrary nor is its dicta, *supra* note 2, to be disregarded because it cites Michigan common law. *Watkins* gave effect to the statute's reach but recognized the common law domain left untouched by the legislature in the realm of comparative and contributory negligence. 783 P.2d at 1299. Although plaintiff offers *Fudge v. City of Kansas*, 239 Kan. 369, 720 P.2d 1093 (1986); *Rollins,* 711 P.2d at 1332-33 (in Kansas, because no duty to wear seat belt, no fault attributable to nonuse); *Ratterree v. Bartlett*, 238 Kan. 11, 707 P.2d 1063, 1069 (1985) (nonuse of seat belt is not evidence of negligence for purposes of contributory negligence or in mitigation of damages); and *Taplin v. Clark*, 6 Kan. App. 2d 66, 626 P.2d 1198 (1981) (improper to use seat belt evidence to reduce liability and fault), to buttress her interpretation, none is a

---

[5]The failure to use a seat belt does not constitute a separate offense "in the absence of another violation of law," Kan. Stat. Ann. § 8-2503(e), and carries a fine of "not more than $10 including court costs." Kan. Stat. Ann. § 8-2504(a)(2).

- 13 -

products liability case, and each, if decided after the statute was enacted, comports with our take of the statute.

Kan. Stat. Ann. § 8-2504(c) is not simply a rule of evidence, which we could then ignore under our diversity jurisdiction, but represents the substantive law of Kansas, one "concerned with the channeling of behavior outside the courtroom, and where as in this case the behavior in question is regulated by state law rather than by federal law, state law should govern even if the case happens to be in federal court." *Barron v. Ford Motor Co. of Canada Ltd*, 965 F.2d 195, 199 (7th Cir.), *cert. denied*, 506 U.S. 1001 (1992); *Moe v. Avions*, 727 F.2d 917, 930 (10th Cir.), *cert. denied*, 469 U.S. 853 (1984). Consequently, although deemed relevant to permit Chrysler to defend its design of the seat back, it is not dispositive of a design defect. A jury could factor the seat belt evidence into its resolution of the issue of whether Chrysler reasonably designed a seat. Although Ms. Gardner is probably correct in suggesting the average juror may not be able to divest the presence of a seat belt with the moral implication it ought to be worn, we must follow the law and not human nature. Indeed, it is the *fact* that Chrysler designed an occupant restraint system that included the seat belt which we cannot foreclose Chrysler from establishing in this case. Because Instruction No. 16 set forth that fact, and we must presume jurors followed the court's instructions, *U.S. Industries, Inc. v. Touche Ross & Co.*, 854 F.2d 1223, 1257 (10th Cir. 1988) (citing *Weber v. Continental Cas. Co.*, 379 F.2d 729, 731 (10th Cir. 1967 ), we hold the trial court

properly admitted evidence of plaintiff's nonuse of the seat belt and appropriately limited its use to disprove a defect.

## II. Exclusion of Plaintiff's Witness

Ms. Gardner claims error sufficient to have altered the result of the verdict when the trial court excluded Paul Sheridan's testimony. Introduction of his testimony would have permitted the jury to assess Chrysler's credibility on the question, whether it really designed its front pedestal seat to collapse in a controlled manner. Ms. Gardner contends, this so-called controlled yield theory was not disclosed during discovery and prejudiced her preparation for trial. Because Mr. Sheridan was competent to provide relevant evidence which might have swayed the jury, she seeks a retrial.

Again, it is helpful to set the context in which this issue arose. In her trial brief, plaintiff represented Mr. Sheridan, though not involved with minivans until after this accident, was named to head up a Minivan Safety Leadership Team (MSLT) in 1993. After watching the television show, *60 Minutes*, which featured an investigative report on the potential for minivan seat back failures, Mr. Sheridan obtained a tape of the show and exhibited it to MSLT. In the aftermath of that viewing, Mr. Sheridan had conversations with various Chrysler employees, including the attorney monitoring Chrysler's interactions with the NHTSA, and raised his concerns about the safety of seat backs. Although under a Michigan court order prohibiting him from revealing any trade secrets and other proprietary information, Mr. Sheridan was designated to testify as a fact witness

to impeach Chrysler's controlled yield design concept. Chrysler objected to the testimony on the basis of competency, relevancy, and prejudice.

After a hearing, the trial court found Mr. Sheridan "wholly unqualified" to testify on seat back failure within the time frame of 1989, FMVSS 207, or anything related to controlled yield. The court concluded Mr. Sheridan had no personal knowledge of seat back design or performance albeit his role on the MSLT, a committee the court characterized was known more for its brainstorming than engineering activities. In a second deposition ordered after the parties first presented this issue, Mr. Sheridan specifically responded he had not reviewed any seat assembly information from 1985 through 1988 and disclaimed calling controlled yield a myth, handing off the issue to the engineering department because the MSLT was concerned with marketing. Thus, not only was Mr. Sheridan not privy to any questions about seat design during the relevant time period, but also he had no competence, notwithstanding his work in truck operations and exterior mirrors. Finally, the court noted the *60 Minutes* feature instigating these concerns involved Chrysler's competitors' vehicles but no Chrysler minivan products.

The court's ruling is not an abuse of discretion tethered as it is to Fed. R. Evid. 402 and 701. Proffered as a fact witness, Mr. Sheridan could not offer any relevant evidence tending to prove any fact at issue in this case: he had no knowledge of the recliner mechanism; had never witnessed a rear end crash test; and while stating "controlled yield" wasn't part of any design criteria, wouldn't elaborate. If offered as an opinion

- 16 -

witness under Fed. R. Evid. 701, his testimony is similarly disadvantaged: his testimony is "limited to those opinions or inferences which are (a) rationally based on **the perception** of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Fed. R. Evid. 701 (emphasis added).

*Graham v. Wyeth Lab.*, 906 F.2d 1399, 1407 (10th Cir.), *cert. denied*, 498 U.S. 981 (1990), is not to the contrary. In that case, we held the district court, the same trial judge who tried this case, abused his discretion in excluding one of defendant's experts from testifying, holding that discretion restricted "viable and relevant theories offered by a party." *Id.* at 1409. The error, we stated, stemmed from the court's fashioning the central issue of the case to be whether endotoxins caused the injury, eliminating the possibility of intervening causes. However, the expert in *Graham,* an ophthalmologist**,** had examined the child at the request of the treating pediatrician and diagnosed an eye problem. That personal involvement and direct knowledge were relevant to defendant's alternative theory that the DPT vaccination did not cause the injury, but the child suffered a stroke prior to receiving the vaccine. Advised by that holding, the trial court here properly framed plaintiff's theory of the case and concluded Mr. Sheridan was incompetent to address any element relevant to her claim.

Having reviewed both of Mr. Sheridan's depositions, we agree, finding his testimony anecdotal, tangential, and equivocal. Although Chrysler argued prejudice as grounds for exclusion, Sheridan, a whistle blower claiming he was fired for speaking out,

Chrysler had ample notice of Sheridan's testimony to anticipate cross-examination and objections. Our concern is bounded by relevancy. The court properly exercised its discretion in excluding it.[6]

### III. Discovery Disputes

Throughout, this case has been pocked by rancorous disputes over discovery: allegations of withholding depositions, failures to respond to interrogatories, and unanswered requests for production, each prompting motions to compel, requests for sanctions, and hearings. Ms. Gardner contends although each noncompliance generated a motion to compel, the trial court failed to resolve the disputes, abnegating its gatekeeper duties in overseeing the case. The court neither balanced the interests when supposed trade secret issues arose nor appreciated the obvious prejudice to plaintiff caused by its inaction. This failure to control discovery, Ms. Gardner contends, hamstrung her effort to prepare for trial on such issues as occupant kinematics, the mechanisms of injury, and seat design. Ms. Gardner urges the cumulative effect of the court's failure to facilitate the discovery process was an abuse of discretion.

---

[6]Plaintiff overstates the trial court's reference to ***Daubert v. Merrill Dow Pharmaceuticals, Inc.***, 509 U.S. 579 (1993), attempting to convert its passing mention of the case into the mistaken basis of excluding Sheridan's testimony because he didn't qualify as an expert witness. There was never a suggestion by the court that Mr. Sheridan was testifying as an expert or the subject of his testimony was scientific knowledge. Taken in context, the trial court's reference to ***Daubert*** was more generic, alluding to the Court's discussion of the trial judge's responsibility to ferret out relevancy and assure a reliable basis for any testimony.

Although there were other hearings addressing Ms. Gardner's motions to compel, we believe the February 27, 1995 proceeding in which the court entertained arguments on her motion to compel responses to interrogatories and requests for production paradigmatizes the trial court's task. At the outset of the hearing, the court lamented plaintiff's inundating it with "a mass of material" from which the court could glean no particularized basis for resolving the dispute. Although plaintiff acknowledged she had received over 15,000 pages of documents from Chrysler, she complained Chrysler merely handed over volumes of documents without any direction, knowing it would be impossible for her to extract the information requested. Despite her requests for test results from rear end crashes, plaintiff protested Chrysler produced only crash test results for front end crashes, claiming it had discarded rear end crash test information in the normal course of its document destruction. Plaintiff insisted all minivan testing was important regardless of when the tests were run, what seat types were involved, and whether the same minivan was used. Chrysler defended its document production not only by stating it had handed over volumes of information but also that plaintiff's discovery should be limited to the uniquely designed seat and recliner mechanism involved in this model Minivan. Chrysler addressed the list of tests plaintiff requested, noting in each instance how each test did not apply to the facts of this case.

With each example of a discovery problem, the trial court implored Ms. Gardner to indicate where in the mass of interrogatories, the specified material appeared. For each

request, plaintiff blamed Chrysler for stonewalling. Nevertheless, at the conclusion of the hearing, plaintiff offered to devise more specific interrogatories, pare down her concerns, and provide copies to Chrysler and the court of the precise discovery sought. Consequently, when plaintiff now characterizes the resolution of that hearing as a **denial** of her motion to compel, amounting to an abuse of discretion, we are dumbfounded. Clearly, plaintiff led the court to believe she would endeavor to resolve this discovery dispute before asking the court again to intervene.

The record discloses another example of the trial court's effort to control the flow of discovery materials. During trial, the court advised counsel that as it approached the issue of Ms. Gardner's evidence of other incidents of seat back failure, the parties should get together and select a few of the forty examples Chrysler had produced. Again Ms. Gardner agreed to pare down the list to accommodate the court's request.[7] Clearly, the trial court was exercising its gatekeeper function to anticipate potential ramifications of this evidence and control its impact. Given the array of accident possibilities sought, the court was justified in thwarting any effort that might lead to confusing this trial with the presentation of vast amounts of evidence involving different seat backs, vehicles, and

---

[7]Indeed, in this Circuit, evidence of similar accidents involving the same product is admissible to establish "notice, the existence of a defect, or to refute testimony given by a defense witness that a given product was designed without safety hazards." ***Robinson v. Missouri Pacific R. Co.***, 16 F.3d 1083, 1089 (10th Cir. 1994) (citations omitted) (internal quotations omitted).

accident scenarios. Again, Ms. Gardner's complaint the trial judge abandoned its gatekeeper role is unfounded in the record.

Thus, our review of the trial court's management of the discovery process in general leaves no doubt it properly supervised the plethora of discovery requested and produced. We will not equate the court's gatekeeper role to that of a micro-manager. If a party is disadvantaged or dissatisfied with discovery responses, it is the party's responsibility to particularize the basis of the request so that the court can properly evaluate the arguments and exercise its discretion. Here, plaintiff neither assisted the court in this process nor objected to the court's accepting her assurances the matters would be resolved by counsel.

The entire record similarly dispels our concern raised by Ms. Gardner's contention Chrysler sandbagged the presentation of her case by waiting until trial began to drop its "controlled yield" product defense, causing surprise and obvious prejudice. In an effort to cushion that blow, Ms. Gardner moved to reopen discovery on an expedited basis to depose some of Chrysler's witnesses, arguing to the trial court that Chrysler's opening argument the seat design was intended to yield rearward in a controlled fashion was contrary to all of its discovery production. Emphasizing that every mention of a controlled yield design postdated the Minivan involved in this accident, Ms. Gardner represented she worried about introducing evidence of remedial conduct by otherwise arguing Chrysler's 1988 model seat collapsed and wasn't designed to yield.

On June 23, 1995, during trial, the court denied the motion based on Chrysler's response to its question whether it had ever taken the position the Minivan seat "in 1987 would not collapse, nor are they intended to collapse in any way?" Chrysler responded it had consistently maintained the seat "did not collapse in this impact.... Never taken the position that this seat would not collapse." In the process of clarifying that answer, Chrysler asserted the seat is intended to yield or, in the court's words "does not stand rigid in the face of a rear-end impact."

We are satisfied the purported sandbagging was more a semantic shift and not a substantive alteration of defense tactics. Although several of Chrysler's witnesses expressed unfamiliarity with the appellation, their testimony evinced a grasp of the concept of a seat designed to protect its occupant by absorbing the energy from kinetic load forces against it. Much of the pretrial discovery involved exploring the witnesses' views on whether a rigid seat back or a more flexible seat back provided greater protection, causing the witness to express an opinion on a seat designed to collapse in some sort of controlled fashion versus one that would be so rigid as to virtually slingshot the occupant in the event of a rear impact. Even Dr. Salczalski, plaintiff's expert who testified he had never seen any design criteria for controlled yield, conceded there are two schools of thought on seat backs: those described as stronger and less yielding versus those that are weaker and more yielding. His recommendation to the NHTSA, he agreed, would make seat backs virtually rigid, built to resist approximately 50,000 inch pounds in

contrast to FMVSS 207 which requires 3,300 inch pounds of resistance. Consequently, we are satisfied that the concepts of "controlled yield," designed to yield, energy absorbing, whatever the designation, were reflected in the pretrial discovery and did not surprise plaintiff at trial simply because the theory acquired a new label. The district court did not abuse its discretion in refusing to reopen discovery.

In a Parthian shot, Chrysler asks we strike references to materials which were not incorporated in the district court record although plaintiff included them in her brief and appendix. Our disposition is not based on those materials as the district court had no opportunity to review them.

In sum, we hold the trial court properly interpreted Kan. Stat. Ann. § 8-2504(c) to admit evidence of the presence of a seat belt in the design of the passenger restraint system and did not abuse its discretion in its evidentiary and discovery rulings. We therefore **AFFIRM**.