1999-NMCA-070

981 P.2d 1215

**NORWEST BANK NEW MEXICO, N.A., Vaughn, New Mexico Branch, as Personal Representative for the Estate of Dao Nguyen, David Abercrombie, Minh Lien Jones, Monte Jones a/k/a Mark Jones, Van Nguyen, Kim Finkel, Individually and as parent and next friend of Christina Finkel, a minor, Theresa**

Jones, as parent and next friend of Robert Tyler Herndon a/k/a Tyler Herndon, a minor, and Hung P. Nguyen, as parent and next friend of Thy Uyen Nguyen a/k/a Mimi Nguyen, a minor, Plaintiffs–Appellants,

v.

**CHRYSLER CORPORATION and Huffines Chrysler Plymouth, Inc., foreign corporations, Defendants–Appellees.**

No. 18,467.

Court of Appeals of New Mexico.

April 9, 1999.

Certiorari Denied May 25, 1999.

**400**

Turner W. Branch, Rebecca C. Branch, Daniel R. Swiss, Arthur M. Solon, The Branch Law Firm, Albuquerque, Patrick A. Casey, Patrick A. Casey, P.A., Santa Fe, Kim E. Kaufman, Albuquerque, for appellants.

Burgain G. Hayes, Leslie Benitez, Clark, Thomas & Winters, P.A., Austin, David R. Tyrrell, Hill, Ward & Henderson, Tampa, Walter J. Melendres, Sarah M. Singleton, Seth D. Montgomery, Andrew S. Montgomery, Montgomery & Andrews, P.A., Santa Fe, for appellees.

## OPINION

BOSSON, Judge.

{1} This crashworthiness case arises from a tragic accident in which several occupants were ejected from a Chrysler minivan and suffered severe injuries. The occupants sued Chrysler Corporation (Chrysler) and Huffines Chrysler Plymouth, Inc. (Huffines), the automobile dealership (hereinafter sometimes referred to collectively as "Chrysler" or "Defendants"), alleging that a defective latch on the rear door caused them to be thrown from the minivan and suffer enhanced injuries. After trial, the jury agreed that the rear door latch was defective, but found that the defect was not a proximate cause of Plaintiffs' injuries, and therefore, the jury determined that Chrysler was not liable in damages to Plaintiffs. Plaintiffs ask us on appeal to reverse the jury verdict and remand for a new trial. They allege two principal points: (1) that in a crashworthiness case alleging enhanced injuries, it was error to instruct the jury in the special verdict form to compare the negligence of the driver with the negligence of Chrysler in making the defective rear door latch; and (2) that it was error to allow Chrysler to seek to mitigate punitive damages by introducing evidence of a corporate policy that encouraged the use of seat belts. Although each of these points has force, we hold that they do not justify reversing the jury verdict in this case. Accordingly, we affirm the judgment of the district court in Chrysler's favor.

## BACKGROUND

{2} On July 21, 1995, Plaintiff Minh Lien Jones was driving a 1990 Plymouth Grand Voyager minivan owned by her fiancé, David Abercrombie, which was headed west on Interstate 40 near Santa Rosa, New Mexico. Her fiancé was in the front seat; her son, mother, two sisters, two nieces, and grandson were passengers in the rear seats. The vehicle suddenly veered sharply to the left and then over-corrected to the right, at which point it hit the guardrail on the north side of the highway, became unstable, and rolled several times. At some point in the crash, five of the seven rear seat occupants were ejected from the minivan. Of those ejected, one died, one lost an arm, and the others were injured more seriously than the four who remained inside the minivan.

{3} The initial cause of the accident was unclear. Plaintiffs contended that a gust of wind caused Ms. Jones to lose control of the vehicle, whereas Defendants suggested that she either fell asleep or was distracted by one of the passengers. At some point in the accident, the rear door of the minivan opened. Plaintiffs contended they were forcefully ejected through the rear door because of a defective latch that caused the door to open. Plaintiffs maintained that Chrysler knew about its defective latch but failed to provide Mr. Abercrombie with a safe latch and led him to believe that the existing, defective latch was safe. Plaintiffs sued Chrysler and its dealer, Huffines, for the torts of strict products liability, negligence, negligent infliction of emotional distress, and negligent misrepresentation, and for a statutory violation of the Texas Deceptive Trade Practices Act (DTPA). *See* Tex.Bus. & Com. Code Ann. §§ 17.41 to 17.63 (West 1987 & Supp.1999).

{4} Chrysler attacked Plaintiffs' case on causation. Chrysler presented evidence to the jury suggesting that the passengers were ejected out the side windows, not the rear

door, and that the rear door latch, even if defective, was not a proximate cause of Plaintiffs' injuries. Defendants also presented evidence that the force of the minivan striking the guardrail was so great that no latch could have withstood such an impact, no matter how safe the design, and thus, this particular latch, no matter how defective, did not cause Plaintiffs' injuries.

{5} Of all the passengers in the minivan, only those in the front seat were wearing seat belts. Before trial, the court granted Plaintiffs' motion in limine to exclude any seat belt evidence. The court prohibited any reference to the seat belts installed in this minivan and their use or nonuse by any of its occupants. During trial, however, Chrysler persuaded the court to allow it to introduce non-specific seat belt evidence for the limited purpose of showing the jury that it was not recklessly indifferent to consumer safety and therefore should not suffer an award of punitive damages. Without being allowed to refer specifically to the seat belts in this minivan or to their use at the time of the crash, Chrysler was permitted to offer evidence that it encouraged the public to use seat belts as a matter of safety.

{6} After a lengthy trial, the jury was asked to answer a series of written interrogatories included in special verdict forms. After only four hours of deliberation, the jury returned a verdict in favor of Chrysler and Huffines on all claims brought by all Plaintiffs. Although the jury found that the rear door latch was defective as alleged, the jury also found that Chrysler's tortious conduct in regard to that latch was *not* a proximate cause of Plaintiffs' injuries, and therefore Defendants were not liable for damages. The special verdict form also instructed the jury to apportion damages by comparing the fault of Ms. Jones, the driver, with any fault of Chrysler and Huffines. The jury concluded that Ms. Jones bore 100% of the fault for Plaintiffs' injuries and that neither Chrysler nor Huffines bore any fault. The jury also indicated that Plaintiffs suffered no compensable injuries and were therefore not entitled to punitive damages.

{7} In addition to the two principal issues on appeal regarding comparison of the driver's fault with the fault of Chrysler and its dealer and the introduction of seat belt evidence, Plaintiffs also challenge the trial court's rulings dismissing Plaintiffs' claims under the DTPA, and they contend that various evidentiary rulings deprived them of a fair trial. In affirming the district court, we discuss in detail only the first two points and dispose of the others summarily.

## DISCUSSION
### Comparing Fault of the Driver

{8} Plaintiffs argue that the special verdict form erroneously allowed the jury to compare the fault of the driver, Ms. Jones, with the fault of Chrysler as part of the process of apportioning liability. Plaintiffs contend that Chrysler was solely responsible for the defective rear door latch, and Chrysler should be solely responsible for all injuries proximately caused by the failure of the latch; that is, those additional "enhanced" injuries caused by being ejected from the minivan through the rear door.

{9} No New Mexico case has yet decided the precise question of whether a defendant in a crashworthiness case may reduce its liability by comparing its own fault for the enhanced injury with the driver's fault in causing the accident. As will shortly be explained, we need not resolve that issue in this opinion. Because the jury found that the defective latch was not a proximate cause of Plaintiffs' injuries, we can assume that Plaintiffs are correct in their contentions and affirm the verdict nonetheless. However, for the sake of clarity and to provide context, we think it instructive to review the status of New Mexico law as it impacts on this issue.

{10} Under *Lujan v. Healthsouth Rehabilitation Corp.*, 120 N.M. 422, 426, 902 P.2d 1025, 1029 (1995), and *Duran v. General Motors Corp.*, 101 N.M. 742, 749–50, 688 P.2d 779, 786–87 (Ct.App.1983) (New Mexico's first reported crashworthiness case), *overruled on other grounds by Brooks v. Beech Aircraft Corp.*, 120 N.M. 372, 383, 902 P.2d 54, 65 (1995), it appears to be settled in New Mexico crashworthiness cases that the cause of the original accident and the cause of a divisible, enhanced injury are successive, not concurrent torts. "Because crashworthi-

ness liability is based only on enhanced or additional injuries, the concurrent tortfeasor concept is not applicable." *Duran,* 101 N.M. at 750, 688 P.2d at 787. The Supreme Court's opinion in *Lujan,* when read together with *Duran* on which it relies, and with *Martinez v. First National Bank of Santa Fe,* 107 N.M. 268, 270–71, 755 P.2d 606, 608–09 (Ct.App.1987) which it rejects, strongly suggests that a successive tortfeasor like Chrysler may *not* use the driver's negligence in causing the accident to reduce its own legal responsibility for enhanced injury. The Supreme Court states in *Lujan* that, "A *Bartlett*-style apportionment of fault is inapplicable to a successive and distinct enhancement of an original injury at the hands of a subsequently negligent physician." *Id.,* 120 N.M. at 426, 902 P.2d at 1029 (referring to *Bartlett v. New Mexico Welding Supply, Inc.,* 98 N.M. 152, 646 P.2d 579 (Ct.App. 1992)); *cf. Cleveland ex rel. Cleveland v. Piper Aircraft Corp.,* 890 F.2d 1540, 1548–50 (10th Cir.1989) (indicating federal court's understanding of New Mexico law as permitting comparative fault between successive tortfeasors; implicitly rejected in *Lujan* ); *Martinez,* 107 N.M. at 270–71, 755 P.2d at 608–09 (suggesting comparative fault might be used to apportion fault among successive tortfeasors; expressly rejected in *Lujan* ).

{11} According to the rule suggested in *Lujan,* juries would complete a two-step calculation in determining liability for enhanced injury in crashworthiness cases. Assuming the evidence shows a divisible injury, the enhanced portion of the injury proximately caused by the fault of the successive tortfeasor would be separated from the lesser injury that would have resulted from the original accident if there had been no crashworthiness defect in the vehicle. The successive tortfeasor would then become liable for the enhanced injury that is proximately caused by that defect. *See Lujan,* 120 N.M. at 426, 902 P.2d at 1029. The original tortfeasor who caused the accident would remain liable

for the entire injury, but with the prospect of indemnification against the successive tortfeasor for that portion of the judgment reflecting the enhanced injury. *See id.* at 427, 902 P.2d at 1030. *See generally* Restatement (Second) of Torts §§ 433A, 433B, 434, 879, 881 (1964); Restatement (Third) of Torts § 50 Apportionment of Liability (Proposed Final Draft, 1998); Gerald W. Boston, *Apportionment of Harm in Tort Law: A Proposed Restatement,* 21 U. Dayton L.Rev. 267 (1996); Brady C. Pofahl, Note, *Original and Successive Tortfeasors and Release Documents in New Mexico Tort Law: Lujan v. Healthsouth Rehabilitation Corporation,* 27 N.M.L.Rev. 697 (1997).[1]

{12} In the matter before us, the special verdict form presented to the jury did not complete this two-step process, but instead instructed the jury as if this were a case of concurrent tortfeasors, like any garden-variety, two-party traffic accident. The jury was instructed:

> Compare the negligence of the following persons and find a percentage for each. The total of the percentages must equal 100%, but the percentage for any one or more of the persons named may be zero if you find that such a person was not negligent or that any negligence on the part of that person was not a proximate cause of Plaintiffs' damages.

| Chrysler Corporation | _____ % |
|---|---|
| Huffines Chrysler Plymouth, Inc. | _____ % |
| Lien Jones | _____ % |
| | _____ % |
| | Total 100% |

The jury completed the special verdict form by allocating 100% of the fault to Lien Jones and 0% to the two Defendants.

{13} In another context, giving this instruction might require reversal. However, before reaching the point of allocating fault, the jury found that the defective latch did not cause any injuries to Plaintiffs.

---

1. The most recent edition of the Restatement (Third) of Torts, Products Liability, § 16 cmt. f (1998), published after the trial in this case, indicates that there may be situations in a crashworthiness case in which the fault of the plaintiff or the driver may be apportioned along with the fault of the defendant responsible for defect-related injury. *See supra* § 16 cmt. f; § 17 cmt. d. The cases cited vary widely according to the apportionment law of each state. It remains to be seen what effect, if any, this portion of the Restatement will have on New Mexico law.

Thus, Plaintiffs were not prejudiced by the jury's fault allocation exercise.

■ {14} We know from the instructions within the verdict form that by the time the jury arrived at allocating comparative fault, its members had already determined that Chrysler's defective rear door latch was not a proximate cause of Plaintiffs' injuries. According to the special verdict instructions, if the jurors found that Chrysler's negligence was not a proximate cause of Plaintiffs' injuries, they were to stop and go no further; they were instructed not to proceed to damages or apportionment of fault. Consideration of divisible injury and responsibility for enhanced injury is only material if the successive tort, here the crashworthiness defect, is established as a proximate cause of the enhanced injury. *See Lujan,* 120 N.M. at 426, 902 P.2d at 1029; *Duran* 101 N.M. at 749–50, 688 P.2d at 786–87.[2]

{15} This Court has previously held that "a finding that there was no proximate cause between the negligence of a defendant and the injuries suffered by a plaintiff, [sic] renders any additional jury findings concerning the allocation of the percentage of fault to be mere surplusage." *Ramos v. Rodriguez,* 118 N.M. 534, 537, 882 P.2d 1047, 1050 (Ct.App. 1994); *see Turpie v. Southwest Cardiology Assocs.,* 1998–NMCA–042, ¶ 17, 124 N.M. 787, 955 P.2d 716 (indicating that a jury finding of no causation "controls all other aspects of the case"). Accordingly, any such error within the verdict form or pertaining to its execution caused Plaintiffs no prejudice; it was rendered harmless once the jury determined that Chrysler's conduct in regard to the rear door latch was not a proximate cause of Plaintiffs' injuries.

■ {16} Notwithstanding the harmless error rule of *Ramos,* Plaintiffs argue that merely by admitting evidence designed to show that the driver was at fault, the court allowed the jury to confuse proximate cause of the accident with proximate cause of the injuries. *See Andrews v. Harley Davidson, Inc.,* 106 Nev. 533, 796 P.2d 1092, 1095–96 (1990) (holding that admission of evidence of driver fault in crashworthiness case was reversible error); *see also Reed v. Chrysler Corp.,* 494 N.W.2d 224, 230 (Iowa 1992) (en banc) (same). At various times during the trial, Defendants emphasized the irrefutable fact that Chrysler did not cause the accident. A defective door latch could not have caused Ms. Jones to lose control of the minivan and leave the road, and the cause of the original accident was clearly irrelevant to a consideration of enhanced injury due to a successive tortfeasor.

■ {17} Even were we to accept Plaintiff's contention that this evidence generated confusion, we do not agree that it results in reversible error in the context of this case. Plaintiffs cannot legitimately complain about the court admitting evidence regarding the cause of the accident. Plaintiffs also introduced such evidence and argued that a gust of wind, not driver inattention, caused their minivan to leave the road. In addition, we know of no motion in limine filed by Plaintiffs to exclude evidence pertaining to the cause of the initial accident. *Cf. Andrews,* 796 P.2d at 1095–96 (reversing verdict for the defendants in part because the trial court should have granted the plaintiff's motion in limine to exclude evidence of cause of accident); *Cleveland ex rel. Cleveland,* 890 F.2d at 1548–50 (in which the plaintiff filed a motion in limine to exclude evidence of cause of crash on ground that it was irrelevant to suit for damages caused by crashworthiness defect). In light of the evidence that the driver caused the accident, it may have been helpful if the jury had been instructed how to differ-

**2.** The special verdict form for almost every Plaintiff began with the question:

Question No. 1: Was the minivan rear door latch manufactured and designed by Chrysler Corporation defective?

The jury's answer was uniformly, "Yes." Immediately following, the jury was asked:

Question No. 2: Was the Defendant Chrysler Corporation's defective latch a proximate cause of the damages to . . . ?

The answer in each case was "No." The jury was later instructed that if it answered "No" to either of these two questions, as well as to similarly paired questions relating to other torts and proximate cause, then "you are to stop and your foreperson should sign the verdict." Only if the jury answered affirmatively to *both* questions, including proximate cause, could it proceed to the questions on damages and comparative fault.

entiate between that portion of Plaintiffs' injuries caused by the defective latch over and above the injuries that would have occurred as a result of the collision absent any defect. But no such instruction was offered.[3]

{18} Plaintiffs argue that when the jury found negligence in Chrysler but no causation, coupled with the allocation of 100% of the fault to the driver, this demonstrates that the jury confused the cause of the accident with the cause of the injuries. Based on this confusion and on what Plaintiffs claim is an inconsistency in the verdict, they argue that the trial judge should have granted them a new trial. Plaintiffs cite federal case law on this point: "[W]here the verdict is inconsistent, indicating either confusion or abuse on the jury's part, a motion for a new trial is not discretionary and a new trial must be granted." *Global Van Lines, Inc. v. Nebeker,* 541 F.2d 865, 868 (10th Cir.1976); *cf. Rhein v. ADT Automotive, Inc.,* 122 N.M. 646, 651, 930 P.2d 783, 788 (1996) (noting that New Mexico appellate courts review orders granting or denying motion for new trial under deferential, abuse-of-discretion standard). However, based on the evidence actually put forth at trial, we cannot agree that the jury's findings were necessarily inconsistent or the product of jury confusion. To the contrary, the jury finding of no causation was supported by substantial evidence free of any confusion between causation of the accident and causation of the injury. At trial, both sides thoroughly contested the cause of Plaintiffs' ejection from the minivan, with Defendants presenting two alternative theories.

{19} Chrysler's accident reconstructionist testified at length, with the aid of an animated video, that the occupants of the minivan were ejected through the side windows and not the rear door. In particular, there was evidence that the force of the rollover threw all the occupants forward rather than backward. There was testimony that the centrifugal force of the accident threw the passengers against the windows and roof of the minivan. Defendants' witness testified that the rear end of the vehicle was elevated on the guardrail as it rolled, so that the ground did not block ejection through the side windows.

{20} There were no independent eyewitnesses to verify the ejection theories of either side, and the jury was free to choose whichever theory it found most persuasive. *See Rhein,* 1996–NMSC–066, ¶ 24, 122 N.M. 646, 930 P.2d 783. Chrysler's theory had other support as well. For example, the animated video apparently showed that one of the occupants may have been pinned against the right side of the vehicle by other passengers, and that her arm was severed by a guardrail post as she was ejected through the right side window. Another passenger may have been thrown out the same window at about the same time. Three more occupants may have been ejected out the left side window as the minivan continued to roll.

{21} In addition, Chrysler presented a second theory from which the jury could have concluded that the defective latch did not proximately cause Plaintiffs' injuries. An expert testified that the force of the accident subjected the latch to over 4000 pounds of force. Chrysler presented evidence that such force would break even a non-defective latch because either the latch or another part of the liftgate structure would not withstand that degree of stress.

{22} In short, the graphic nature of the evidence allowed the jury reasonably to infer that the defective latch did not proxi-

**3.** Jury Instruction No. 9, given at Chrysler's request, sets forth Chrysler's defense that the driver was negligent and that her negligence "was the proximate cause of the enhanced injuries and damages sustained by a plaintiff." This instruction, when combined with the comparative fault section in the special verdict form, might have led the jury incorrectly to believe that it need not consider whether the defective latch was the proximate cause of enhanced injuries simply because the driver, not the defect, caused the accident. However, although Jury Instruction No. 9 may be incomplete, it does not on its face require the conclusion that the jury incorrectly based a finding of no proximate cause in Chrysler on a finding that the defect did not cause the accident. This is especially true in light of the alternative theories of causation upon which the jury could reasonably have based its verdict. Moreover, because Plaintiffs do not argue the potentially prejudicial effect of Jury Instruction No. 9, we feel constrained not to explore its possible effects ourselves.

mately cause Plaintiffs' injuries. The evidence allowed the jury to conclude that either Plaintiffs were ejected through the side windows and not the rear door, or the latch would have succumbed to the forces of the accident in any event. *See Duran*, 101 N.M. at 749, 688 P.2d at 786 (stating that the plaintiff must prove that defective design caused injuries over and above those which otherwise would have been sustained). As a result, Plaintiffs' insistence that the jury must have been confused reduces to little more than conjecture. We cannot ignore the evidence and reasonable inferences that support the jury's decision. *See Zemke v. Zemke*, 116 N.M. 114, 118, 860 P.2d 756, 760 (Ct.App.1993) ("When there is conflicting evidence, on review the appellate court considers the evidence in the light most favorable to the prevailing party and indulges in all reasonable inferences that can be drawn from the evidence in support of the judgment."); *see also In re Estate of Heeter*, 113 N.M. 691, 695, 831 P.2d 990, 994 (Ct.App. 1992) ("On appeal, error will not be corrected if it will not change the result ."). We cannot reverse a facially valid jury verdict just because of a theory under which the jury *might* have been confused and *possibly* come to its conclusion for the wrong reasons. Under that standard, few verdicts could withstand scrutiny on appeal, and finality would prove elusive. *See Hinger v. Parker & Parsley Petroleum Co.*, 120 N.M. 430, 442, 902 P.2d 1033, 1045 (Ct.App.1995).

### Seat Belt Evidence in Mitigation of Punitive Damages

{23} Plaintiffs argue that the trial court's admission of seat belt evidence, even when limited to mitigation of punitive damages, violated New Mexico law. *See* NMSA 1978, § 66–7–373(A) (1993); *Mott v. Sun Country Garden Prods., Inc.*, 120 N.M. 261, 263–64, 901 P.2d 192, 194–95 (Ct.App.1995). For the reasons that follow, we do not agree.

{24} The historical development of New Mexico's policy regarding seat belt evidence derives from both the judicial and legislative branches of government. *See id.* at 263–65, 901 P.2d at 194–96. In *Thomas v. Henson*, 102 N.M. 417, 424, 696 P.2d 1010, 1017 (Ct.

App.1984), *rev'd in relevant part,* 102 N.M. 326, 695 P.2d 476 (1985) [hereinafter *Thomas I* ], this Court attempted to create a common-law duty requiring an occupant of an automobile to fasten the seat belt "as part of the continuing duty to exercise reasonable care for his or her own safety ... unless the circumstances dictate otherwise." We reasoned that the creation of such a duty would allow for "the apportionment of damages" between the negligent tortfeasor who caused the accident, and the negligent occupant of the vehicle who aggravated his or her own injuries by not wearing a seat belt. *See id.* at 423–24, 696 P.2d at 1016–17. We acknowledged that no such duty had previously existed at common law. *See id.* at 423, 696 P.2d at 1016.

{25} The New Mexico Supreme Court responded swiftly. On its own motion, the Court issued a writ of certiorari and reversed our opinion on the ground that "the creation of a 'seat belt defense' is a matter for the Legislature, not for the judiciary." *Thomas v.. Henson,* 102 N.M. 326, 327, 695 P.2d 476, 477 (1985) [hereinafter *Thomas II* ]. Reacting almost simultaneously, the 1985 legislative session took up the issue and enacted the Safety Belt Use Act ("the Act"), 1985 N.M.Laws ch. 131 (codified at NMSA 1978, §§ 66–7–370 to –373 (1985, as amended through 1993)). The Act created a statutory duty for front seat passengers to wear seat belts, but it specifically provided that the failure of those passengers to wear seat belts as required by the Act "shall not in any instance constitute fault or negligence and shall not limit or apportion damages." Section 66–7–373(A). The Act imposed no duty on rear seat passengers.

{26} The use of seat belt evidence was recently clarified in *Mott,* in which we stated that the language of Section 66–7–373(A) does not "indicate any intent to allow the introduction of evidence of failure to use seat belts for *any* purpose in a negligence action." *Mott,* 120 N.M. at 267, 901 P.2d at 198 (emphasis added). As we noted in *Mott,* the actions of both the Supreme Court and the Legislature have spoken clearly against the admission of such evidence. *See id.* In sum, the common law of New Mexico does

not impose any duty to wear seat belts, and the statutory duty imposed on front seat occupants cannot form the basis for either liability or apportioning damages in a civil lawsuit. After *Mott* and *Thomas II*, specific evidence of the nonuse of seat belts is simply inadmissible in New Mexico's civil trials.[4]

■ {27} Chrysler seeks to distinguish this case law on several grounds. First, Chrysler argues that the Act does not apply to this case because the ejected occupants had been seated in the rear, and on its face, the Act only applies to front seat passengers. We agree that the Act does not impose any duty on rear seat occupants to wear seat belts, and therefore does not apply directly to the rear seat passengers in this case.

{28} However, we fail to see how this distinction leads to the conclusion Chrysler urges. The Act in one sense simply leaves unchanged the common-law rule that there is no duty to wear seat belts. If there is no duty, specific evidence of use or nonuse is irrelevant to any issue in the case, in particular apportionment of damages. *See Mott,* 120 N.M. at 265, 901 P.2d at 196 (citing *Armijo v. Atchison, Topeka & Santa Fe Ry. Co.,* 754 F.Supp. 1526, 1535 (D.N.M.1990), *rev'd in part on other grounds,* 19 F.3d 547, 27 F.3d 481 (10th Cir.1994)).

{29} Given the history of this Court's previous attempt to create such a duty, we are not anxious to cover that ground again. Were we to do so, the holding Chrysler urges would place us in direct conflict with our Supreme Court and the Legislature. Even worse, however, would be the inconsistent rules it would create. There is no merit or logic in saying that nonuse of available seat belts by rear seat passengers can be used to reduce their recovery of damages, while the same exercise is forbidden by the Act for front seat passengers.

{30} Chrysler bases an alternative argument on this being a crashworthiness claim sounding in products liability. Chrysler argues that the design of the vehicle as a whole includes the availability of seat belts and their use by Plaintiffs and the entire design should be considered in determining whether a design flaw creates "an unreasonable risk of injury." *See* UJI 13–1406 NMRA 1999. Chrysler asks us to consider that seat belts were installed as a safety design feature in the minivan to prevent the same ejection-related injuries that occurred here. We note that neither *Thomas II* nor *Mott* were crashworthiness cases, and no New Mexico case has yet held seat belt evidence inadmissible in a crashworthiness lawsuit against the manufacturer arising out of a single-car accident.

{31} We need not answer the crashworthiness issue directly. As we shall discuss shortly, the seat belt evidence was admitted in this case solely to mitigate punitive damages, and we decide the dispute on that basis. Nonetheless, we cannot help but observe that in *Thomas I* this Court relied, in part, on the crashworthiness model of *Duran* to argue for a common-law duty to wear seat belts, and that opinion was, of course, summarily reversed. *See Thomas I,* 102 N.M. at 426–27, 696 P.2d at 1019–20; *Mott,* 120 N.M. at 263–65, 901 P.2d at 194–96 (interpreting *Thomas II* as indicating that specific evidence of seat belt nonuse is not admissible in any negligence action for any purpose). *But cf. Gardner v. Chrysler Corp.,* 89 F.3d 729, 737 (10th Cir.1996) (affirming allowance of seat belt evidence as relevant to safety design of car seat but not for comparative fault).

---

4. We note the forceful special concurrence of our colleague, Judge Hartz, urging a different direction for the common law of New Mexico, much as our former colleague, Judge Bivens, spoke fifteen years ago in *Thomas I.* The parallels between the two opinions, written so many years apart, suggest that those views still do not command a majority or reflect a consensus view on this subject. Contrary to the predictions expressed about what today's Supreme Court might do with this issue, we believe our Court has made a conscious decision to defer to the Legislature on this one controversial aspect of the law of negligence. Surely that is the Court's prerogative and not without precedent. Moreover, we fail to detect any groundswell of opposition to the rule. Over the past fifteen years, the daily occurrence of motor vehicle accidents has afforded both the public and the able members of our State Bar innumerable opportunities to challenge *Thomas II* anew, if they wished to do so. The silence since 1985 suggests that the rule does not offend community norms to the degree intimated, which, in turn, supplies a strong measure of legitimacy to the present status of our common law.

{32} Chrysler relies primarily on what was successful below: its right to mitigate Plaintiffs' demand for punitive damages. *See* UJI 13–1827 NMRA 1999 (indicating mitigating circumstances are to be taken into account in determining punitive damages). No prior New Mexico opinion, nor as best we can tell, any reported decision has yet directly addressed the question whether seat belt evidence may be admitted for this purpose despite being inadmissible otherwise.

{33} Initially, we emphasize that Chrysler was only permitted to introduce evidence of its general corporate policy to encourage seat belt use; Chrysler was not authorized to introduce case-specific evidence regarding the use or nonuse of seat belts by any passenger or party. We observe that the Act, on its face, does not address non-specific seat belt evidence that is not directed to the actual use or nonuse of seat belts by the parties. *See* § 66–7–373(A) ("Failure to be secured by a . . . safety belt as required by the Safety Belt Use Act shall not in any instance constitute fault or negligence and shall not limit or apportion damages.") (internal citation omitted). Our prior opinions focus similarly on the actual use of seat belts. *See Mott,* 120 N.M. at 267, 901 P.2d at 198. Absent a specific prohibition regarding non-specific seat belt evidence, our analysis begins with the question whether Chrysler's general policy of encouraging seat belt use is relevant to the issue of punitive damages. *See generally* Rule 11–402 NMRA 1998 ("Evidence which is not relevant is not admissible.").

{34} Whenever there is a claim for punitive damages, evidence of mitigation is appropriate. *See, e.g., Gonzales v. Surgidev Corp.,* 120 N.M. 133, 148, 899 P.2d 576, 591 (1995) (discussing mitigation evidence regarding punitive damages); *see also* UJI 13–1827. In support of their claim for punitive damages, Plaintiffs presented expert testimony attempting to show that Chrysler exhibited a corporate policy of utter disregard for the safety of its customers. One particular expert, Mr. Flanagan, testified about Chrysler's policy of indifference towards consumer safety. He charged Chrysler with behaving irresponsibly based on the manner in which Chrysler developed its rear door latch and then failed to respond to safety problems as they arose. Mr. Flanagan summarized his critique of Chrysler by referring to what was called "twenty points of corporate misconduct" regarding the latch. In directing Mr. Flanagan's testimony, Plaintiffs' counsel repeatedly asked him questions about whether Chrysler had exhibited good corporate conduct or conduct typical of a "good corporation doing good things for good people." (TR 1558) Not surprisingly, Mr. Flanagan answered that Chrysler had not, and that its conduct was bad. Thus, during their own case in chief, Plaintiffs made Chrysler's corporate policy towards consumer safety an issue for the jury.

{35} Chrysler chose to rebut the charge of indifference and bad corporate character, among other ways, by showing that it encouraged the public to use seat belts. Although the relevance of such a policy to this case was surely debatable, we traditionally allow a trial court considerable latitude on questions of relevance, which would include issues of mitigation. *See* Rule 11–401 NMRA 1999 (" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."); Rule 11–103(A) NMRA 1999 ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected."); *Gonzales,* 120 N.M. at 148, 899 P.2d at 591 (discussing mitigation evidence regarding punitive damages); *see also Kelly v. Ford Motor Co.,* 1996 WL 639832 (E.D.Pa. 1996) (discussing, without resolving, introduction of seat belt evidence to mitigate punitive damages); *Hanover Ins. Co. v. Hayward,* 464 A.2d 156, 158–59 (Me.1983) (discussing broad standard of judicial discretion to admit evidence in mitigation of punitive damages); *Schaffer v. Edward D. Jones & Co.,* 521 N.W.2d 921, 925–28 (S.D.1994) (allowing evidence of positive aspects of corporate management of investments to rebut charge of bad corporate character). *See generally* Linda L. Schlueter & Kenneth R. Redden, *Punitive Damages* § 5.4 (3d ed.1995).

{36} At the conclusion of the Flanagan direct examination, the trial court indicated it was strongly influenced by considerations of fairness in allowing Chrysler the opportunity to balance "what appears to be extremely damaging information, twenty points of misconduct."[5] Thereafter, Chrysler's witnesses were allowed to testify that the corporation had a policy of encouraging the use of seat belts, and that this policy was an example of Chrysler being a "good manufacturer" and a "responsibly acting manufacturer." On cross-examination, Mr. Flanagan conceded that he was aware that Chrysler's letter to minivan owners included the statement that, according to both Chrysler and the National Highway Traffic Administration, the "single most important safety action [drivers] can take" is to make sure all occupants are wearing seat belts at all times. On final argument, counsel repeated this reference to Chrysler's corporate policy toward seat belts in arguing that Chrysler was not reckless and indifferent to safety, but without any mention of any seat belt use specific to this case.

{37} We cannot say the court abused its discretion in concluding that such evidence was relevant to mitigating a demand for punitive damages. Arguably, it was fairly related to rebutting Plaintiffs' evidence of Chrysler's bad corporate character. But relevance is only half the inquiry. Plaintiffs insist that even if this non-specific seat belt evidence were relevant to mitigation, they were unfairly prejudiced because the jury inevitably used the evidence to speculate about: (1) whether the minivan was equipped with seat belts; (2) whether any of the injured passengers were wearing them; and (3) whether nonuse of seat belts was a "cause" of Plaintiffs' injuries. The trial court itself acknowledged "the potential of prejudice to the Plaintiffs" from admitting such testimony, and that "it has the potential of perhaps confusing the jury." Expressing the dilemma, the trial judge stated:

Well, the problem is that every time I do it, that only heightens the jury's probably inherent knowledge about this problem. And every time I give them that limiting instruction, they're wondering why the hell they haven't heard testimony about who was and wasn't using seat belts in that vehicle.

{38} We agree with the trial court and with Plaintiffs about the risks of allowing such evidence. If the jury did speculate about the use or nonuse of seat belts in this case, it might have been led to speculate that Plaintiffs should be faulted or their damages reduced if they were not wearing seat belts. That, of course, would be contrary to the stated policy of our Supreme Court that there is no duty to wear seat belts in New Mexico absent a mandate from the Legislature. *See* § 66–7–372(A); *Thomas II*, 102 N.M. at 327, 695 P.2d at 477. However, it is impossible for this Court to say with any degree of confidence whether the jury actually engaged in such conjecture in this case. To the extent that the jury's reaction can be gauged with respect to this non-specific seat belt evidence, our judicial system best leaves that task to the discerning eye of the trial court. *Cf. Placek v. City of Sterling Heights*, 52 Mich.App. 619, 217 N.W.2d 900, 901–02 (1974) (when specific evidence of seat belt nonuse by the plaintiffs was wrongly introduced, court was inclined to assume prejudice), *rev'd on other grounds*, 405 Mich. 638, 275 N.W.2d 511 (1979).

{39} Our courts have repeatedly recognized that the trial court is in the best position to evaluate the effect of trial proceedings on the jury. *See, e.g., Romero v. State*, 112 N.M. 332, 334, 815 P.2d 628, 630 (1991) ("The trial court was in the best position to determine if, in the overall context of the case, evidence ... was relevant[.]"); *State v. Marquez*, 1998–NMCA–010, ¶ 12, 124 N.M. 409, 951 P.2d 1070 (same). For this reason, the trial court is vested with broad discretion to determine under Rule 11–403 whether the probative value of evidence is

---

5. The court stated: "It just doesn't seem right to me that the Plaintiffs should be allowed to introduce that testimony [Flanagan's twenty points of corporate misconduct], have the jury receive the benefit of the testimony on the one hand, and to prohibit the Defendants from introducing testimony with respect to what its position is and to rebut, at least attempt to prove to this jury that its conduct was not perhaps as callous as the Plaintiffs would like for the jury to believe."

substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *See City of Santa Fe v. Komis,* 114 N.M. 659, 663, 845 P.2d 753, 757 (1992). We will not disturb the trial court's decision on appeal unless that discretion is abused. *See State v. Martinez,* 94 N.M. 50, 52, 607 P.2d 137, 139 (Ct.App.1980). "We will find an abuse of discretion when the court's decision is 'without logic or reason, or that it is clearly unable to be defended.' " *McDowell v. Napolitano,* 119 N.M. 696, 702, 895 P.2d 218, 224 (1995) (quoting *Newsome v. Farer,* 103 N.M. 415, 420, 708 P.2d 327, 332 (1985)).

{40} In reviewing the trial court's assessment of prejudice, we note first that the court tried to minimize the risk of unfair prejudice by instructing the jury to limit its consideration of seat belt evidence, if at all, to the issue of punitive damages. *See Gray v. General Motors Corp.,* 434 F.2d 110, 113 (8th Cir.1970) (trial judge offered to instruct jury to disregard seat belt evidence); *United States v. Brown,* 902 F.Supp. 1410, 1419 (D.Kan.1995) (indicating jury is presumed to follow court's instruction to consider evidence for one purpose but not another), *aff'd sub nom. United States v. Hayden,* 108 F.3d 341 (10th Cir.1997); *State v. Sellers,* 117 N.M. 644, 650, 875 P.2d 400, 406 (Ct.App.1994) (noting jury is presumed to follow court's instructions). The limiting instruction, repeated more than once to the jury, stated in part:

> I want to advise you [the jury] that the Defendants will be allowed to introduce evidence and testimony that in their communications with their customers, the federal government, and the general public, their corporate conduct encouraged the use of seat belts. This evidence may be considered by you solely on the issue of whether or not punitive damages should be awarded against the Defendants, and in what amount, if any.

Plaintiffs maintain that the limiting instruction was ineffective and only served to highlight the seat belt evidence in the minds of the jury. We point out that the language of the limiting instruction was achieved through the concurrence of all counsel, and while Plaintiffs fully preserved their objection to the evidence, there was no objection to the form of the instruction. Later in the trial, Plaintiffs' counsel asked the trial court to read the limiting instruction again to the jury. *See State v. Peterson,* 103 N.M. 638, 642, 711 P.2d 915, 919 (Ct.App.1985) (indicating party cannot complain about relief it requested). In our judgment, the jury was carefully instructed on the limited use of nonspecific seat belt evidence, and we assume the jury followed such instructions absent evidence to the contrary. *See State v. Stallings,* 104 N.M. 660, 663, 725 P.2d 1228, 1231 (Ct.App.1986) (noting appellate court assumes that jury follows the trial court's UJI instruction).

{41} We also observe that by the time Chrysler sought to question Flanagan about seat belt policy, some general references to seat belts had already come before the jury. For example, during voir dire one prospective juror asked one of the attorneys whether any of the Plaintiffs had been wearing seat belts at the time of the accident. After a bench conference, the court instructed the jury panel not to consider the issue. Shortly thereafter, during opening statement, counsel for Plaintiffs showed the jury Chrysler's recall letter pertaining to this make and model of minivan. In that recall letter, read to the jury at the very outset of the trial, Chrysler encouraged its customers to wear seat belts as a safety precaution. This was little different from what Chrysler later proposed, and what the court allowed, by referring to its general corporate policy of encouraging seat belt use. After the conclusion of the trial, the court noted that the jury had first learned about seat belts from Plaintiffs, not Chrysler, which fact was of some influence on the court in its decision to deny Plaintiffs' motion for a new trial. In our view, the court was entitled to weigh these factors in assessing the overall risk of unfair prejudice to Plaintiffs from this evidence.

{42} In the context of this case, we are also impressed with the trial court's expressions of concern for fairness and what it called an "uneven playing field." The court felt compelled to permit Chrysler some latitude on this subject precisely because of the

Flanagan testimony about "twenty points of corporate misconduct." The trial judge is uniquely situated, at ground zero, to balance the benefits and burdens from such evidence. Under this very limited circumstance, when the court displays such concern and proceeds in such a measured manner, the sound exercise of judicial discretion should not lightly be disturbed.

{43} We might be more concerned about the prejudicial effect of even the non-specific seat belt evidence in this case, if there were no dispute that the defective latch caused Plaintiffs to be ejected through the rear door of the minivan. In that situation, we could more easily conclude that, in finding no causation from the defective latch, the jury must have speculated that the passengers were not wearing seat belts. However, as we noted at the outset, Chrysler placed before the jury substantial evidence of two alternative theories of causation: (1) that the passengers were ejected through the side doors, or (2) that the force of the collision was so great that no latch would have kept the rear door shut. Either theory supports this jury finding that there was no causation from a defective latch without relying on speculation about seat belts.

{44} We might also be concerned if Chrysler's seat belt policy were the only evidence offered in mitigation of punitive damages, in which case Chrysler's plea for fairness might ring hollow as mere pretext. We note, however, that Chrysler's witnesses addressed many of Flanagan's "twenty points of corporate misconduct" without any reference to seat belts. They talked glowingly of Chrysler's record for vehicle safety, its extensive commitment to research and testing in regard to safety, and its responsiveness to governmental and consumer concerns. Generally, they sought to characterize Chrysler as a company whose first concern was safety over profit. On final argument, Chrysler's counsel made reference to Chrysler's seat belt policy, but only in conjunction with these and other points of evidence allegedly attesting to Chrysler's good character. Whether this evidence was credible to a jury is immaterial to this Court on appeal. We recite it only to support our conclusion that general seat belt evidence of this type may in certain cases be appropriate to mitigate a claim for punitive damages.

{45} We do note our concern over two later references to seat belts that were not so limited in content and that occurred after the court's ruling. First, an investigating police officer, Officer Fenner, on cross-examination by Plaintiffs, revealed to the jury that the front seat passengers in the minivan were belted in, and for that reason he assumed (incorrectly as it happened) that they were the only ones not ejected from the minivan. Of course, this fact-specific reference to seat belt use ran afoul of the court's order, both as established initially and as later modified. Perhaps because the answer came on Plaintiffs' cross-examination and seemingly by inadvertence, Plaintiffs made no objection nor moved to strike, and the matter passed without comment. The trial court later characterized Officer Fenner's remark as "inadvertent." We are not persuaded that this testimony was so offensive as to undermine the trial court's ruling about the probative value of the non-specific evidence it allowed.

 {46} In one instance of clear abuse of the court's order, another Chrysler witness, Mr. Schultz, testified on direct examination about Chrysler's corporate policy of encouraging seat belt use, and, though not in response to a question, he injected, "The seat belt is the first line of defense in an accident." This brought an immediate objection, recess of the jury, and a sharp reprimand from the trial court. Upon Plaintiffs' request, the remark was stricken from the record, the jury was advised to disregard it, and the same limiting instruction was again read to the jury that seat belt evidence was relevant only to punitive damages. Plaintiffs did not move for a mistrial, although they did move unsuccessfully for a default judgment, and the trial continued. Having persuaded the trial court to do what it could to mitigate the damage from the statement, Plaintiffs had a choice either to move for a mistrial or to proceed. This was a tactical decision, one with which we might sympathize given the expense of getting that close to a verdict, but it was a tactical decision nonetheless, and

this was not lost upon the trial court in explaining its reasons for not granting a new trial. *See Davila v. Bodelson,* 103 N.M. 243, 249, 704 P.2d 1119, 1125 (Ct.App.1985) (having not moved for mistrial, party cannot base reversal upon question that was stricken at trial). We are persuaded that the court reacted appropriately under the circumstances to this surprise comment from Chrysler's witness, and it does not justify reversal of the jury verdict.

{47} Although we do not reverse on the seat belt issue, we emphasize the very narrow scope of our ruling. Our decision in this case should in no way be construed as permitting the introduction of case-specific evidence about the use or nonuse of seat belts for any purpose. There has never been, and there still is no "seat belt defense" in New Mexico. Furthermore, it is not our intention to invite even non-specific seat belt evidence every time punitive damages are at stake. We hold no more than that there may be circumstances when non-specific evidence of a general corporate policy encouraging seat belt use, like any other potentially mitigating evidence, may be appropriate to rebut a charge of reckless indifference to safety. In the proper circumstances, and when viewed with a skeptical eye, admission of such evidence will not necessarily be reversible error. The key ingredient is context, and that involves weighing and assessing the circumstances of a given case.

### Remaining Claims

{48} Among several other claims, Plaintiffs filed a request for relief under the DTPA, Tex.Bus. & Com.Code Ann. §§ 17.44 to 17.56, which essentially entities a consumer to civil relief for damages caused by misrepresentations or other forms of deception made in the course of a sale or similar transaction. Because the Chrysler minivan was purchased from the Huffines dealership in Texas, Plaintiffs sued under the DTPA on the basis of alleged misrepresentations by both Defendants concerning the safety of the rear door latch. On a motion at the conclusion of Plaintiffs' case, the court directed a verdict in Defendants' favor in regard to all claims under the DTPA except for the claims

of Plaintiff Abercrombie, the owner of the minivan. The court relied on the theory that the DTPA affords relief to purchasers, as consumers, but not to mere passengers. *See Rodriguez v. Ed Hicks Imports,* 767 S.W.2d 187, 191 (Tex.Ct.App.1989). Plaintiffs did not seriously contest this distinction below, and they do not appear to contest that ruling on appeal. In any case, it appears the trial court correctly dismissed the passengers as they were not entitled to relief under the DTPA, and Plaintiffs have not cited to us any Texas authorities to the contrary.

{49} With respect to Abercrombie's individual claim for misrepresentations under the DTPA, the trial court initially rejected the motion for directed verdict because Abercrombie was a consumer under the Act. However, at the conclusion of all the evidence, the court reconsidered the motion, heard additional argument, received legal briefs, and then granted the motion. The court relied on the legal theory that to be actionable under the DTPA, any misrepresentations by Defendants concerning the latch had to be part of the inducement that caused the purchase of the minivan. Later statements that arose during the continuing relationship between Abercrombie and Defendants fell outside the scope of causation as defined by the DTPA. *See Camden Machine & Tool, Inc. v. Cascade Co.,* 870 S.W.2d 304, 311 (Tex.Ct.App.1993) (defining causation under the DTPA). Because it was undisputed that any misrepresentations by Defendants concerning the latch occurred years after Abercrombie bought the minivan, the court ruled that such misrepresentations, even if they occurred as alleged, could not have induced the purchase. Plaintiffs dispute this ruling, but on the basis of the case law cited to us, we find Plaintiffs' argument unpersuasive. *See id.; Padgett v. Bert Ogden Motor's, Inc.,* 869 S.W.2d 532, 536 (Tex.Ct.App. 1993) (indicating actionable misrepresentations concerning safety of vehicle must be made at time of purchase or before).

{50} Parenthetically, we note that the court did submit to the jury a similar claim for common-law negligent misrepresentation that generally arose out of the same statements and events, but which was not con-

fined to the time of purchase. The jury found that Defendants had indeed misrepresented facts to Plaintiffs, but as with the rest of Plaintiffs' claims, the jury found that such deception had not proximately caused their injuries. Accordingly, it would be difficult for us to conclude that the trial court's disposition of the DTPA claims, even if erroneous, would likely have led to any different result before this jury.

{51} Finally, Plaintiffs claim reversible error from certain evidentiary matters, including a videotape which differed slightly from one that had been shown to Plaintiffs before trial, and certain questions on Defendants' cross-examination of one of the Plaintiffs that erroneously implied to the jury that Plaintiffs had pursued other lawsuits against Defendants seeking compensation for these same injuries. Both matters were called to the attention of the trial court which exercised its discretion appropriately in resolving the disputes. Plaintiffs were afforded additional time and opportunity to respond to the claimed surprise of the videotape, and the court concluded there was no material change in the tape that seriously threatened prejudice to Plaintiffs. Plaintiffs did not request a continuance. *See In re Kenny F.*, 109 N.M. 472, 475, 786 P.2d 699, 702 (Ct.App.1990) (finding no reversible error where the plaintiff did not request a continuance despite claim that cross-examination of expert witness was impeded by alleged delayed disclosure of report). The improper cross-examination by defense counsel led to official admonishment by the court as well as a curative instruction to the jury. There was no motion for mistrial. *See Davila*, 103 N.M. at 249, 704 P.2d at 1125 (holding trial court did not commit error in not declaring a mistrial when the plaintiff made no request for a mistrial). We are not persuaded that the trial court improperly handled these issues or otherwise abused its discretion.

{52} Finally, these and other matters, including those addressed in this opinion, were presented to the court after judgment in Plaintiffs' motion for new trial. Although acknowledging the deferential standard by which we review a trial court's exercise of discretion in rejecting a motion for new trial, Plaintiffs nonetheless insist they were denied a fair trial by virtue of all the foregoing judicial errors and contamination of the process that occurred in the course of this lengthy and hard-fought trial. But "[t]he granting or denial of a new trial rests within the sound discretion of the trial court and its ruling will not be disturbed in the absence of a clear abuse of discretion." *Martinez v. Schmick*, 90 N.M. 529, 532, 565 P.2d 1046, 1049 (Ct.App.1977).

{53} We conclude from the pleadings and a review of the hearing that the trial court gave careful consideration to each of the grounds set forth in the motion. In the end, the court determined that Plaintiffs had received a fair trial, that the verdict was not clearly and palpably contrary to the weight of the evidence, and that there had been no fatal contamination of the process. In other words, justice to all parties had been served. We are not persuaded by Plaintiffs' argument that the court abused its discretion in arriving at this decision.

## CONCLUSION

{54} For the foregoing reasons we affirm the judgment of the district court based upon the jury verdict in this cause. The parties shall bear their own costs on appeal.

{55} **IT IS SO ORDERED.**

BUSTAMANTE, J., concurs.

HARTZ, Judge (specially concurring).

{56} I concur in the result. I also concur in the discussion in the majority opinion that supports the holdings. My concerns relate to the extensive discussion in the opinion that is unnecessary to the result. As is often true of such discussion, it creates as much confusion as clarity in the law, even when the underlying reasoning appears to be basically sound.

{57} I will restrict my specific remarks to the opinion's dictum with respect to the inadmissibility in a personal-injury action of evidence that the plaintiff failed to use a seat belt. The majority opinion properly holds that the district court did not err in permitting Chrysler to rebut Plaintiffs' punitive-

damages evidence with evidence that Chrysler encouraged the use of seat belts. But that is all the opinion needs to say about seat-belt evidence. It is unnecessary for the opinion to address whether a defendant may try to reduce or avoid altogether an award of compensatory damages by putting on evidence that the plaintiff's injuries resulted, at least in part, from the plaintiff's negligent failure to wear a seat belt. Moreover, the majority's views with respect to such evidence are unpersuasive. Contrary to the majority opinion, I believe that our Supreme Court would permit the use of such evidence to reduce the liability of a defendant. I will set forth my reasoning below. To summarize my conclusions, although it would be improper to inform the jury that the failure to use a seat belt violated the New Mexico statute on the subject, the jury should be permitted to determine whether failure to use a seat belt constituted a failure to exercise due care to protect oneself, resulting in a reduction in recoverable damages in accordance with the law governing comparative fault.

{58} It is worth considering why Plaintiffs here were so vigorously opposed to the admission of any evidence indicating that they were not wearing their seat belts and that they would not have been ejected from the vehicle if they had been wearing them. The reason for Plaintiffs' concern, of course, is that a jury would be strongly influenced by the evidence. Most jurors would find Plaintiffs negligent for failing to wear their seat belts and would be likely to reduce any award of damages to Plaintiffs if there was credible evidence that Plaintiffs would not have been ejected from their vehicle had they been wearing the belts. I am confident that the great majority of adults in this state would agree that juries should consider seat-belt usage in a lawsuit arising out of a motor-vehicle collision. Their sense of justice tells them that failure to wear a seat belt is negligence and that such negligence is a proper consideration in deciding how much, if any, damages should be awarded.

{59} Yet, according to the majority opinion, the law of New Mexico forbids consideration of a plaintiff's failure to wear a seat belt. When the common law has strayed so far from the sense of justice of ordinary persons (those who are not judges or lawyers), it is time for a change. *See generally* Melvin A. Eisenberg, *The Nature of the Common Law* 9–10, 14–26, 43–49 (1991). Bringing common sense to this area of the law does not require any radical revision of common-law notions. It requires only a return to long-standing traditions.

{60} The general principle is clear. As stated in the Uniform Jury Instructions promulgated by our Supreme Court: "Every person ... has a duty to exercise ordinary care for the person's own safety[.]" UJI 13–1604 NMRA 1999; *see* Restatement (Second) of Torts §§ 463, 464 (1965) (Restatement). When a plaintiff fails to exercise ordinary care for his or her own safety, the plaintiff is negligent. If that negligence contributes to the plaintiff's injuries, the jury compares the plaintiff's negligence to the negligence of the others contributing to the injury, and the plaintiff's recovery of damages is reduced accordingly. *See* UJI 13–2218 NMRA 1999; UJI 13–2219 NMRA 1999.

{61} On what common-law basis, then, could a court forbid the jury from considering a plaintiff's failure to wear a seat belt? I can see none. Objections to such evidence that may have been persuasive in the past are not persuasive now.

{62} Perhaps at one time seat belts were used so rarely, and the advantages of their use were so little known, that a court could say as a matter of law that failure to wear a seat belt was not negligence. After all, years ago most motor vehicles did not include seat belts. But those days are long gone. Although there may still be rational adults who believe that seat belts are not worth the trouble, it would be closer to the mark to say that failure to wear a seat belt is negligence as a matter of law than to say that it is reasonable as a matter of law.

{63} Also, perhaps at one time courts could justify refusal to allow seat-belt evidence because such refusal ameliorated the harshness of the doctrine of contributory negligence. Under the now-abandoned rule of contributory negligence, if the plaintiff was negligent in any respect that contributed to

the plaintiff's injuries, the plaintiff could recover nothing from a negligent defendant, regardless of how much at fault the defendant may have been. Hence, no matter how badly the plaintiff would have been injured even if the plaintiff had been wearing a seat belt, the plaintiff may not have been able to recover any damages if the jury found that the plaintiff was negligent for failing to wear a seat belt and that the injuries were enhanced because of that failure. But the regime of contributory negligence ended in New Mexico almost two decades ago. *See Scott v. Rizzo,* 96 N.M. 682, 634 P.2d 1234 (1981). The adoption of comparative fault in *Scott* eliminates this justification for excluding seat-belt evidence.

{64} A third possible ground for excluding seat-belt evidence is more subtle. Even after the adoption of comparative fault, courts might have feared that seat-belt evidence would make trials unwieldy. Perhaps the plaintiff would have suffered injuries even if wearing a seat belt. Damages for such injuries should not be reduced because of any fault of the plaintiff in not wearing a seat belt. But as the parties try to convince the jury how to apportion the plaintiffs injuries between those that would have been suffered even if the plaintiff had been wearing a seat belt and those suffered as a result of not wearing a belt, the trial could be cluttered with confusing evidence. Better to avoid the problem, the argument goes, by not allowing any evidence regarding seat-belt use.

{65} That argument lost all force, however, once courts recognized crashworthiness causes of action against motor vehicle manufacturers and distributors. *See Brooks v. Beech Aircraft Corp.,* 120 N.M. 372, 902 P.2d 54 (1995) (alleged design defect of failing to include shoulder harness in airplane). A key feature of such cases is the apportionment of the injury between what was caused by the crashworthiness defect and what would have occurred even if the vehicle had no such defect. New Mexico has not refrained from recognizing this cause of action on the ground that apportionment evidence would be too time-consuming or too difficult to evaluate. Looking at the very case before us,

does it make any sense to say that it is appropriate for the jury to assess what injuries resulted from the failure of the latch but not to assess what injuries resulted from the failure to wear seat belts? Surely not.

{66} In short, if left to its own devices, the common law of New Mexico would now recognize the relevance in this case of Plaintiffs' failure to wear seat belts.

{67} But what of the argument that a "seat-belt defense" is of such importance that creation of the defense should be left in the first instance to the Legislature? That was the position adopted by our Supreme Court in *Thomas v. Henson,* 102 N.M. 326, 327, 695 P.2d 476, 477 (1985). Today, however, it is not a position that our Supreme Court could follow without engendering poisonous cynicism about the judiciary.

{68} First, it is misleading to speak of a "seat-belt defense." There is nothing unique about a defendant's arguing that a plaintiff was negligent in not wearing a seat belt and should therefore receive lower damages. All the defendant seeks is the standard instruction that "[e]very person ... has a duty to exercise ordinary care for the person's own safety." UJI 13–604. The jury can then decide on its own, based on the evidence at trial, whether failure to wear a seat belt was negligence and whether the plaintiff's injuries were caused or aggravated by such failure. There is no more need for the common law to "create" a new "seat-belt defense" than there is a need to create a "don't walk across the highway with your eyes closed" or a "don't open the emergency door to an airplane when it is flying above the clouds" defense. Every lawsuit presents unique facts. The common law does not set forth a laundry list of specific conduct that constitutes negligence. Rather, it establishes the general principle of due care. There is no reason not to apply this general principle to failure to wear a seat belt.

{69} Moreover, even if the so-called "seat-belt defense" could be considered a new common-law defense, it would be disingenuous for a New Mexico court today to say that creation of such a defense must be left to the Legislature. The New Mexico judiciary has hardly hesitated to embrace major

changes to the common law. Four years before leaving the "seat-belt defense" to the Legislature in *Thomas,* 102 N.M. at 327, 695 P.2d at 477, our Supreme Court abolished contributory negligence in favor of comparative negligence, *see Scott,* 96 N.M. at 683, 634 P.2d at 1235. More importantly, since its decision in *Thomas* our Supreme Court has recognized a number of new or expanded causes of action for plaintiffs. *See, e.g., Wilschinsky v. Medina,* 108 N.M. 511, 775 P.2d 713 (1989) (duty of physicians to third persons); *Schmitz v. Smentowski,* 109 N.M. 386, 785 P.2d 726 (1990) (prima facie tort); *Lovelace Med. Ctr. v. Mendez,* 111 N.M. 336, 805 P.2d 603 (1991) (wrongful pregnancy); *Collins v. Tabet,* 111 N.M. 391, 806 P.2d 40 (1991) (duty of guardian ad litem); *Saiz v. Belen Sch. Dist.,* 113 N.M. 387, 827 P.2d 102 (1992) (duty arising from employment of independent contractor to perform inherently dangerous work); *Ford v. Board of County Comm'rs,* 118 N.M. 134, 879 P.2d 766 (1994) (duty of landowners); *Beech,* 120 N.M. 372, 902 P.2d 54 (products liability); *DeVaney v. Thriftway Marketing Corp.,* 1998 NMSC–001, 124 N.M. 512, 953 P.2d 277 (malicious abuse of process). Only a few weeks ago our Supreme Court recognized a loss-of-chance cause of action. *See Alberts v. Schultz,* 1999–NMSC–15, 126 N.M. 807, 975 P.2d 1279. If, for example, a physician's malpractice caused the patient to lose a 20 percent chance of survival, the physician would be liable for damages equal to 20 percent of the value of the patient's life. *See id.* ¶ 32. Apparently, if the malpractice caused the patient to lose a 51 percent chance of survival (so that the malpractice probably caused the patient to die), the estate would not be entitled to recover the full value of the patient's life (as under traditional rules of causation) but only 51 percent of the value of the life. *See id.* The modification of the law regarding causation resulting from adoption of a loss-of-chance cause of action appears to be a far more profound break with common-law tradition than any "seat-belt defense" would be.

{70} To be sure, the above examples of modification of the common law generally expand liability. They mostly favor plaintiffs. A seat-belt defense, in contrast, favors defendants. But no principle says that the common law can move in only one direction. Thus, I am confident that as a matter of common law our Supreme Court would now permit a defendant in a motor-vehicle-accident case to present evidence that the plaintiff's failure to wear a seat belt was negligence and contributed to the plaintiff's injuries.

{71} The common law, however, is not always the last word. It can be trumped by a statute. Regardless of what the courts might rule as a matter of common law, the courts must obey a legislative enactment. Therefore, I must also address NMSA 1978, Section 66–7–373(A) (1993). This provision is part of the Safety Belt Use Act, NMSA 1978, Sections 66–7–370 to –373 (1985, as amended through 1993). The heart of the Act is Section 66–7–372, which requires that seat belts be worn by front-seat occupants of a motor vehicle with a gross vehicle weight under five tons when the vehicle is traveling on a street or highway.

{72} The provision of the Act pertinent to personal-injury litigation is Section 66–7–373(A). It states: "Failure to be secured by a child passenger restraint device or by a safety belt as required by the Safety Belt Use Act shall not in any instance constitute fault or negligence and shall not limit or apportion damages." Note that this provision does not say that the failure to wear seat belts shall not constitute fault or negligence. It says that "failure to be secured by a child passenger restraint device or by a safety belt *as required by the Safety Belt Use Act* shall not in any instance constitute fault or negligence and shall not limit or apportion damages." *Id.* (emphasis added). Why does the statute include the emphasized language? If the purpose of the statute were simply to eliminate the "seat-belt defense," then would not the clearest language be "failure to be secured by a child passenger restraint device or by a safety belt shall not in any instance constitute fault or negligence and shall not limit or apportion damages"? What makes the statutory language particularly striking is that the Safety Belt Use Act requires only a front-seat occupant to wear a seat belt. Section 66–7–373(A) says nothing about whether the failure of a rear-seat occupant to

wear a seat belt is negligence. (In our case the injured Plaintiffs were in the rear seat.)

{73} In my view, the most reasonable interpretation of Section 66–7–373(A) is that a defendant cannot use the Safety Belt Use Act to help prove that a plaintiff was negligent. Absent Section 66–7–373(A), a defendant could argue that a front-seat plaintiff's failure to fasten a seat belt constituted negligence as a matter of law, because such failure violates Section 66–7–372. The general rule is that "[s]tatutory violations are negligence per se if the statute violated was enacted for the benefit of the person injured." *Fitzgerald v. Valdez*, 77 N.M. 769, 773, 427 P.2d 655, 657 (1967); *see* Restatement, *supra*, § 286. But the general rule can be overcome by a statutory enactment to the contrary. Section 66–7–373(A) forecloses the negligence-per-se argument.

{74} Not only does this interpretation fit the literal meaning of the statutory language, but it also fits the historical context of the enactment. In 1985, the year in which the Safety Belt Use Act was first enacted, our Supreme Court had stated that the common law does not recognize a "seat-belt defense." *See Thomas*, 102 N.M. at 327, 695 P.2d at 477. If there was sufficient hostility among legislators to a seat-belt defense, those favoring the Safety Belt Use Act could not obtain passage without a provision making sure that the Act would not affect the outcome of personal-injury litigation. Section 66–7–373(A) accomplishes that.

{75} In short, Section 66–7–373(A) has the effect, and apparently had the purpose, of ensuring that the Safety Belt Use Act does not change the common law. But it does not preclude the courts themselves from modifying the common law. We should make that modification at the next opportunity.